1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

The Honorable ROBERT J. BRYAN

**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA**

ROBIN FARRIS, *et al.,*

                                        Plaintiffs,

        v.

DAVE SEABROOK, *et al.,*

                                        Defendants.

NO. C11-05431-RJB

DEFENDANTS' BRIEF IN
OPPOSITION TO PLAINTIFFS'
MOTION FOR PRELIMINARY
INJUNCTION

## I.        INTRODUCTION

        Washington's campaign finance laws placing contribution limits on recall elections are a constitutional means to address corruption and the appearance of corruption which, if left unchecked, threaten the integrity of the Washington's electoral system.  Through Washington's Constitution, the state initiative process, and legislation enacted by their elected representatives, Washington voters have crafted an election recall and recall campaign system. Like elections involving the selection of public officials, recall elections in Washington are subject to statutory contribution limits.  Contributors to both recall political committees and to elected officials being recalled are subject to these limits.  The limit is $800 per individual contributor for county government recall elections.  That is the status quo in Washington as designed by the people.

        Plaintiffs seek to alter this status quo at the height of the election season.  They ask this Court to enjoin the recall election contribution limit despite their failure to satisfy the

DEFENDANTS' BRIEF IN OPPOSITION
TO PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

1

mandatory criteria necessary to obtain a preliminary injunction.  They seek this extraordinary relief despite their knowledge of the challenged contribution limit statute since at least October 2010.  Finally, they request this relief despite the fact that the Defendants have been unable to conduct discovery to test Plaintiffs' assertions and to provide this Court a fully developed factual record on the issues raised.

Unlike the case in *Citizens for Clean Government v. City of San Diego*, 474 F.2d 647 (9th Cir. 2007) (*CFCG*), Defendants here do not concede that there is no risk of corruption in a recall election.  Like the *CFCG* court held, however, Defendants do believe that this Court should not strike down the constitutionality of an important state campaign finance statute at this preliminary stage and without a fully developed factual record.  *Id.* at 654.

Defendants ask the Court to deny Plaintiffs' motion for preliminary injunction based on Plaintiffs' failures to satisfy the injunction criteria.

## II.        STATEMENT OF FACTS

### A.        Washington's Recall Election Law

The right to recall elected officials is set forth in Article I, §§ 33 and 34 of the Washington Constitution.  Section 34 of the state constitution, among other things, directs the Legislature to adopt laws setting forth procedures members of the electorate can use to recall an elected official.  It does not restrict the people or the Legislature from enacting recall procedures or campaign finance provisions concerning those recall elections.

Articles concerning the history of the recall process describe that the adoption of recall procedures was part of the reform activities occurring in the Populist Movement, including during the Progressive Era from the 1890s to the 1920s, and particularly in the Western states and localities.  Ellis Decl. ¶ 19.  Those mechanisms included efforts to enable more direct decision-making by the people, sometimes referred to as direct democracy.  *Id.*

Statutes setting forth specific recall election procedures are currently codified in Wash. Rev. Code (RCW) § 29A.56.  Any legal voter may initiate a recall election by preparing a

DEFENDANTS' BRIEF IN OPPOSITION
TO PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

2

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 664-9006

typewritten charge, naming the officer and the acts of misfeasance, malfeasance, or violation of the oath of office that constitute the basis of the recall.  RCW § 29A.56.110.  The voter then files the charge with the relevant elections official, and the appropriate official prepares a ballot synopsis.  RCW § 29A.56.120-.130.  State courts determine whether the charges are both legally and factually sufficient.  RCW § 29A.56.140.  If so, signatures are gathered on a petition to place the question on a ballot.  RCW § 29A.56.150.  If a sufficient number of valid signatures are certified within the statutory time period, a recall election is scheduled.  RCW § 29A.56.210.  If the recall is successful, the official is discharged and the office vacated.  RCW § 29A.56.260.   Once vacated, a successor is appointed.  *See, e.g.,* RCW § 36.16.110 (appointment process for county officials).  Washington is described as one of four states where following a successful recall election, a successor is appointed (rather than immediately elected or elected at another time).  Ellis Decl. ¶ 27.

Washington's history shows that the people are highly interested in creating and overseeing the state recall process.  They created election procedures to determine not only whether a person is qualified to represent them (through candidate elections) but also whether a person is no longer qualified to represent them (through a recall election).  Ellis Decl. ¶ 28.  Both types of elections involve individual persons:  a candidate for office in a candidate election and an elected official in a recall election.  Ellis Decl., Ex. A.  Both types of elections typically have a "vetting" procedure whereby a percentage of the people determine if that decision should move forward, either through a primary election, or through a signature-gathering phase.  *Id.*

**B.      Campaign Finance Laws Governing Recall Elections**

The formation of political committees to collect contributions and make expenditures in support of or opposition to candidates and elected officials is yet another attribute shared by both candidate and recall elections.   In 1992, the electorate, expressing concern about

DEFENDANTS' BRIEF IN OPPOSITION
TO PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

3

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 664-9006

1  unlimited campaign contributions and the impact on elected officials, adopted Initiative 134 by

2  a 72 percent margin.  Laws of 1993, ch. 2, § 2 (RCW § 42.17.620)[1]; Ellis Decl. ¶¶ 44-45.

3      Among other things, Initiative 134 imposed contribution limits on certain political

4  committees.  *See* RCW § 42.17.640.  Limits applicable to candidates for state office were

5  provided in Initiative 134, and applied to recall elections of those officials.  In 2006, the

6  Legislature established contribution limits for other offices, including candidates for county

7  office in a county that has over 200,000 registered voters.  Laws of 2006, ch. 348, § 3.[2]  As

8  enacted, this bill also applied RCW § 42.17.640's contribution limits to persons holding those

9  applicable elected offices "against whom recall charges have been filed or to a political

10  committee having the expectation of making expenditures in support of the recall of a person

11  holding the office."  *Id.*[3]  Section 640(3) likewise was amended in 2006 to apply contribution

12  limits to recall elections for county officials.  RCW § 42.17.640 was amended again in 2010 to

13  apply the county limits to all county officials and to the recall elections of those officials.

14

15  [1] RCW § 42.17.620 provides:
       By limiting campaign contributions, the people intend to:

16     (1)  Ensure that individuals and interest groups have fair and equal opportunity to influence elective and
            governmental processes;

17     (2)  Reduce the influence of large organizational contributors; and
       (3)  Restore public trust in governmental institutions and the electoral process.

18  [2] The legislation was first introduced in 2005 as House Bill 1226.  The bill report for HB 1226 describes that there
    was no public testimony against the bill.  The summary of testimony in 2005 in support of the bill states in part

19  that persons testified that it was time to "update the contribution limits law."

20        Currently, Washington limits campaign contributions to candidates running for state legislative
          offices and statewide executive offices.  These laws have been enacted due to the potential for

21        undue influence from individuals and groups making large campaign contributions.  Additionally,
          real or perceived influence threatens public confidence in government.  It is essential that we
          protect the election process and our government by limiting campaign contributions to candidates

22        for any office for which the realistic potential for this problems exists.

23  HB 1226 did not pass both houses in 2005, but it did so in 2006.  The 2006 bill report for 3SHB 1226 describes
    again that there was no testimony provided in opposition to the bill.  It summarizes the testimony in support of the

24  bill (which also would enact new contribution limits for judges), describing in part that:
          The bill has received a lot of support.  Many newspapers have supported the bill.  We have more

25        reason than ever to expand the will of the people.  We have seen money in extraordinary measure
          flow into the offices covered under this bill in recent years.  With events at the federal level we are
          increasingly aware of the influence of special interests to undermine the public trust.

26  Ellis Decl. ¶¶ 50, 51.
    [3] Originally codified as RCW § 42.17.640(1), it is now codified in subsection (1)(g) of that statute.

DEFENDANTS' BRIEF IN OPPOSITION
TO PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION                        4                ATTORNEY GENERAL OF WASHINGTON
                                                              1125 Washington Street SE
                                                              PO Box 40100
                                                              Olympia, WA 98504-0100
                                                              (360) 664-9006

1   Laws of 2010, ch. 206, § 1.

2   **C.**     **The Committee to Recall Dale Washam (RDW)**

3         **1.**     **Robin Farris And RDW**

4         Plaintiff Committee to Recall Dale Washam (RDW) is a political committee subject to

5 regulation under Washington's campaign finance law.[4]  Plaintiff Robin Farris (Farris) is

6 RDW's campaign manager and founder.  Prior to founding the recall campaign, Farris claims

7 no political experience.  Farris Decl. ¶ 9.  Her decision to found and manage the campaign,

8 however, has lead to speculation that she may be interested in pursuing politics in Pierce

9 County.  In a profile that appeared in the Tacoma News Tribune, Farris, when asked whether

10 she "saw a future in politics"  indicated that "[s]he wouldn't rule out a run for office at this

11 stage, but she says she's not sure."  Ellis Decl. ¶ 36.

12         Although Farris is a political novice, a number of well-known Pierce County politicians

13 have joined the committee as "honorary co-chairs."  Ellis Decl. ¶ 38.  These "honorary co-

14 chairs" include the two candidates Dale Washam defeated in the 2008 election for the Pierce

15 County Assessor-Treasurer position.   Ellis Decl. ¶ 39.   These honorary co-chairs have

16 considerable years of experience conducting local and state elections.  Ellis Decl. ¶ 38.

17         Other local elected officials are certainly aware of RDW.  The most notable is a Pierce

18 County Council member who has posted comments on the RDW Facebook website about the

19 council's role in the appointment process should the recall succeed.  This council member has

20 also declared himself as a candidate for Pierce County Assessor-Treasurer's race (Washam's

21 current position) in the 2012 election.  Ellis Decl. ¶ 34.

22

---

23 [4] For PDC regulatory purposes, RDW is a political committee.  *See* RCW § 42.17.020(39) ("political committee"
defined as "any person (except a candidate or an individual dealing with his or her own funds or property) having

24 the expectation of receiving contributions or making expenditures in support of, or opposition to, any candidate or
any ballot proposition").  Plaintiffs acknowledge RDW is a political committee in their complaint, but nonetheless

25 refer to themselves as "grass roots activists" in their pleadings.  *See* Complaint, Dkt. 1 ¶4 and Mot. for
Preliminary Injunction, Dkt. 13 at 1, ln.16.  Plaintiffs' self-identification as "grass roots activists" should be

26 distinguished from the term "grass roots lobbying campaigns," which is a term of art under Washington's
campaign finance disclosure law and which has no application in this case.  *See* RCW § 42.17.200.

DEFENDANTS' BRIEF IN OPPOSITION
TO PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

5

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 664-9006

### 2.   RDW's Contributions

Since its inception, the vast majority of RDW's contributions have fallen far below the $800 contribution limit imposed by RCW § 42.17.640(3). Based on the latest available campaign finance disclosure forms (as of July 11, 2011), RDW has raised a total of $35,010 and spent $22,886. Perkins Decl. ¶ 7. Since receiving its first contribution on November 17, 2010, one hundred and forty-seven (147) itemized contributors have made cash contributions to RDW. The average contribution is approximately $221.

Only fifteen (15) of these contributors (10 percent of the total cash contributors) have contributed to the $800 individual limit.[5] Of these maximum contributors, only one, Ms. Mell, has expressed a desire to contribute in excess of this amount. *See* Mell Decl. ¶ 11. Despite the $800 contribution limit, Ms. Mell has still supported the RDW committee in other ways by purchasing donated items at less than their fair market value at an RDW fund-raising auction. Perkins Decl. ¶ 7e.[6]

### 3.   Oldfield & Helsdon And Its Representation Of RDW

#### a.   The Sufficiency Hearing

Plaintiff Oldfield & Helsdon is a law firm that has represented RDW in at least three matters. Initially, Oldfield & Helsdon provided legal counsel to RDW for the recall sufficiency hearing before the Pierce County Superior Court and, later during the appeal of the superior court's ruling to the Washington State Supreme Court. Helsdon Decl. ¶¶ 14-17. The superior court issued an order finding that the recall petition was sufficient on December 16, 2010. The Supreme Court upheld the superior court's ruling on March 3, 2011.[7]

---

[5] As of June 8, 2011, RDW had received a single in-kind contribution totaling $800. Perkins Decl. ¶ 7d. This contribution was from Oldfield & Helsdon for legal services provided to RDW during the sufficiency hearing before the Pierce County Superior Court. *Id.*

[6] Purchasing an item at less than fair market value does not constitute a contribution for purposes of Washington's campaign finance laws. WAC 390-05-235; Perkins Decl. ¶ 7e.

[7] *In the Matter of the Recall of Dale Washam*, 2011 WL 1796435 (Wash.). The date of the Supreme Court's order is important because RDW could not commence collecting the signatures necessary to place the recall on the ballot until after the order issued. *See* RCW § 29A.56.150.

DEFENDANTS' BRIEF IN OPPOSITION
TO PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

6

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 664-9006

1

### b.      Paid Signature Gatherers Litigation

2      The second matter involved a lawsuit against Washington's Secretary of State in which

3   RDW sought a declaration that certain Washington laws criminally prohibiting the

4   employment of signature gatherers were unconstitutional.  Anderson Decl. ¶ 12e.  This lawsuit

5   resulted in entry of a federal district court consent decree on February 9, 2011.[8]

6      Although this decree authorized RDW to use paid signature gatherers during its recall

7   efforts, a February 11, 2011 newspaper article announcing the court order quoted Farris as

8   stating that use of paid signature gatherers "was a contingency," "but the goal is that we don't

9   use paid signature-gatherers."   Anderson Decl. ¶ 12e.  Farris continued to adhere to this

10   position through RDW's initial signature gathering efforts.  For example, in an April 26, 2011

11   posting on the RDW website, Farris elaborated on her reasoning:

12
> Instead of using supporter contributions to rent halls, pay for booths or pay for
> professional signature gathering servicing, I decided the best use of the donations
13
> at this time is to pay for an advertisement which will be an insert in the News
> Tribune.  This opportunity offers a way to move things along rapidly.  I felt the
14
> most effective use of the dollars received via the 'power of the people'
> contributions for the recall campaign was to pay for a full page insert in The
15
> News Tribune.

16   Anderson Decl. ¶ 12f.

17

### c.      Commission Enforcement Action and the Stipulation

18      The third and final matter in which Oldfield & Helsdon represented RDW was an

19   administrative enforcement proceeding commenced by the PDC relating to allegations that, by

20   accepting an in-kind contribution of legal services valued in excess of $500 from Oldfield &

21   Helsdon, RDW violated Washington's voluntary mini-reporting provisions.[9]   These

22   compliance issues first arose in December 2010, when PDC staff notified RDW that its receipt

23   of in-kind legal services from Oldfield & Helsdon during the sufficiency proceedings might

24   jeopardize RDW's mini-reporting status.  Anderson Decl. ¶ 7.  In response, RDW informed the

25

---

[8] *Committee to Recall Dale Washam v. McKenna*, United States District Court Western Washington Cause No. 11-CV-05049-BHS.

26   [9] *See* explanation of mini-reporting option at Ellis Decl. ¶¶ 82-84.

DEFENDANTS' BRIEF IN OPPOSITION
TO PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

7

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 664-9006

PDC that it intended to convert from the mini-reporting option to full reporting.  *Id.* at Ex. A. At this time, it became apparent that in-kind legal services RDW received from Oldfield & Helsdon might also violate the $800 individual contribution limit for recall campaigns in Section 640(3), and which applied because RDW switched from mini-reporting to full reporting.  Perkins Decl. ¶ 8, Ex. B.  PDC Staff notified RDW and its attorneys of these problems and provided guidance regarding how to bring RDW into compliance with state campaign finance laws.  *Id.*  During a January 14, 2011 telephone call, Tom Oldfield informed PDC staff that he disagreed that his law firm's pro bono services were subject to the $800 contribution limit and indicated that his client was prepared to file a lawsuit if enforcement was commenced.  *Id.* at Ex. C.  Despite this threat and PDC's enforcement actions, no lawsuit materialized at that time.

On February 9, 2011, PDC staff filed administrative charges against RDW alleging that the receipt of in-kind legal services violated the mini-reporting requirements and RCW § 42.17.640(3)'s $800 contribution limit.  Ellis Decl. ¶ 86a.  On February 15, 2011, Oldfield & Helsdon sent a letter to PDC Staff and their legal counsel arguing that RCW § 42.17.640(3) was unconstitutional.[10]  Helsdon Decl. ¶ 25, Ex. B.  PDC staff subsequently withdrew the charge related to Section 640(3) and issued an Amended Notice of Administrative Charges on March 29, 2011.  Ellis Decl. ¶ 87.

On April 24, 2011, the parties entered into a Stipulation as to Facts, Violations and Penalty (the Stipulation) resolving the mini-reporting violation.  Ellis Decl. ¶¶ 86, 88; Ex. H. Among other things, the Stipulation provided:

> The PDC recognizes that pro bono legal services rendered by Oldfield & Helsdon, PLLC to RDW after the December 16, 2010 hearing with regard to assisting RDW with the Supreme Court appeal by Dale Washam do not constitute a contribution as defined in RCW 42.17.020(15)(c).

_____

[10] This letter was copied to William Maurer, lead counsel for Plaintiffs in this case.  Helsdon Decl., Ex. B.

DEFENDANTS' BRIEF IN OPPOSITION
TO PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

8

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 664-9006

1   Ellis Decl., Ex. H.  It also stated that "[b]y virtue of the Commission's issuance of an order

2   approving this stipulation, Recall Dale Washam surrenders all rights to appeal, or otherwise

3   seek judicial review of, such order."  *Id.*  The Commission accepted the Stipulation in an Order

4   dated April 28, 2011.  *Id.*  On that same day, Farris posted the following statement on the

5   RDW website:  "The PDC has always been fair and generous to the Committee and I

6   appreciate their understanding."  Ellis Decl. ¶¶ 8, 86d.

7        As of the filing of this brief, this case will be slightly over one month old.  No

8   discovery has been done; no lay-down discovery has been exchanged; no written discovery has

9   been served; no depositions scheduled.  As a result, Defendants have been unable to directly

10  test Plaintiffs' factual assertions; instead, they have been forced to scour newspaper articles,

11  Internet websites, social media sites, and campaign finance documents filed with the PDC to

12  pull together sufficient facts to defend against Plaintiffs' motion.   Until such time as

13  Defendants have had such an opportunity to fully develop the record, this action will not be

14  ripe for final resolution.

15              **III.    LEGAL ARGUMENT**

16  **A.    Preliminary Injunction Standard**

17        "[A] preliminary injunction is an extraordinary and drastic remedy, one that should not

18  be granted unless the movant, *by a clear showing,* carries the burden of persuasion."  *Mazurek*

19  *v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in the original) (quoting 11A C. Wright, A.

20  Miller, & M. Kane, Federal Practice and Procedure § 2948, pp. 129-30 (2d ed. 1995)).  To

21  prevail, plaintiffs seeking a preliminary injunction must establish all four of the following

22  elements:  (1) they are likely to succeed on the merits, (2) they will suffer irreparable harm in

23  the absence of injunctive relief, (3) the balance of equities weighs in their favor, and (4) an

24  injunction is in the public interest.  *Winter v. Natural Resources Defense Council, Inc.*, 555

25  U.S. 7, 129 S. Ct. 365, 374 (2008).

26

1    Preliminary injunctions can take two forms.  "A prohibitory injunction prohibits a party

2    from taking action and 'preserves the status quo pending a determination of the action on the

3    merits.'"  *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 878-79

4    (9th Cir. 2009) (quoting *Chalk v. U.S. Distr. Court*, 840 F.2d 701, 704 (9th Cir. 1988)).  The

5    status quo means "the last, uncontested status which preceded the pending controversy."  *Id. at*

6    879.  A mandatory injunction, on the other hand, seeks relief prior to trial that goes well

7    beyond preserving the status quo and, as a consequence, "is particularly disfavored."  *Id.*

8    Parties seeking mandatory injunctions must meet a "high burden."  *Thalheimer v. City of San*

9    *Deigo,* __ F.3d __, 2011 WL 2400779 (9th Cir. 2011).  "When a mandatory preliminary

10   injunction is requested, the district court should deny such relief 'unless the facts and law

11   clearly favor the moving party.'"  *Stanley v. Univ. of Southern Calif.,* 13 F.3d 1313, 1320 (9th

12   Cir. 1994) (quoting *Anderson v. United States*, 612 F.2d 1112, 1114 (9th Cir. 1979)).

13       In this case, Plaintiffs seek a preliminary injunction preventing the enforcement of

14   Washington's contribution limits against Plaintiffs pending a final judgment in this case.  By

15   affirmatively prohibiting the State from enforcing a duly enacted law, this relief, if granted,

16   changes the status quo before trial.   Accordingly, to prevail, Plaintiffs must meet the

17   heightened burden applicable to motions for mandatory injunctions.  Because neither the law

18   nor the facts clearly favor Plaintiffs, this court should deny the motion.

19   **B.    Plaintiffs Are Not Likely To Succeed On The Merits**

20       **1.    RCW § 42.17.640(3) Is To Be Reviewed Under "Exacting Scrutiny"**

21       The First Amendment of the U.S. Constitution protects the speech rights of the citizens

22   of the United States including the right to engage in political speech rights and the right to

23   associate.  These rights, however, are not absolute and can be regulated.  *See Buckley v. Valeo,*

24   424 U.S. 1, 25 (1976).  In *Buckley,* the Supreme Court decided that a less exacting standard of

25   constitutional review applied to laws restricting contributions because such laws only

26

DEFENDANTS' BRIEF IN OPPOSITION
TO PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

10

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 664-9006

1   marginally restricted the exercise of First Amendment rights.[11]   *Id.* at 20; *compare Citizens*

2   *United v. FEC,* 130 S. Ct. 876, 898 (2010) (applying strict scrutiny to a complete corporate ban

3   on independent expenditures).  "Exacting scrutiny" requires that the contribution limit support

4   a "sufficiently important interest" and be closely tailored so as not to "unnecessarily abridge"

5   constitutional rights.   *Id.* at 25.   Governmental interests in deterring corruption or the

6   appearance of corruption are "constitutionally sufficient justification" for the imposition of

7   contribution limits.  *Id.* at 26.[12]

8          **2.      Recall Elections Are Hybrid Elections Involving Real Persons Which Are**
               **Appropriately Subject To Contribution Limits And RCW § 42.17.640(3)**
9              **Correctly Recognizes That Fact**

10         A state's interest in limiting political contributions is strongest when the limits apply to

11   contributions made directly to political candidates as these types of contributions are most

12   closely correlated with the prevention of *quid pro quo* corruption.  *Long Beach Area Chamber*

13   *of Commerce v. City of Long Beach*, 603 F.3d 684, 696 (9th Cir. 2010) (quoting *N.C. Right to*

14   *Life, Inc. v. Leake,* 525 F.3d 274, 291 (4th Cir. 2008)).  As the Supreme Court held in *Citizens*

15   _____

16   [11] The Supreme Court explained:
           [A] limitation upon the amount that any one person or group may contribute to a candidate or political
17         committee entails only a marginal restriction upon the contributor's ability to engage in free
           communication. . . . A limitation on the amount of money a person may give to a candidate or campaign
18         organization . . . involves little direct restraint on his political communication, for it permits
           the symbolic expression of support evidenced by a contribution but does not in any way infringe the
19         contributor's freedom to discuss candidates and issues.  While contributions may result in political
           expression if spent by a candidate or an association to present views to the voters, the transformation of
20         contributions into political debate involves speech by someone other than the contributor.
     *Buckley,* 424 U.S. 20-21.

21   [12] Despite Plaintiffs' assertions otherwise, *see* Mot. at 12 n. 2, strict scrutiny is not the appropriate constitutional
     standard.  The less rigorous standard of "exacting scrutiny" is to be used to determine whether a limit on political
22   contributions is constitutional.  *Buckley,* 424 U.S. at 25; *Randall v. Sorrell,* 548 U.S. 230, 247 (2006).  The Ninth
     Circuit confirmed that "exacting scrutiny" should be used to evaluate the constitutionality of contribution limits,
23   regardless of the recipient of the contribution.  In *CFCG, supra,* the court expressly rejected a contention that
     contribution limit was subject to strict scrutiny and instead subjected the limits imposed upon a recall campaign
24   during the signature gathering phase to exacting scrutiny.  474 F.3d at 651-52.  Similarly, in *Citizens Against Rent*
     *Control/Coalition for Fair Housing v. Berkley (CARC)*, the U.S. Supreme Court used exacting scrutiny to analyze
     whether contribution limits applied to ballot measure committees survived First Amendment scrutiny.  454 U.S.
25   290, 298-99 (1981).  *See also Nixon v. Shrink Missouri Gov't PAC,* 528 U.S. 377 (2000) (contributions to
     candidates); *Montana Right to Life Ass'n v. Eddleman*, 343 F.3d 1085 (9th Cir. 2003) (political committee
26   contributions); and *Jacobus v. Alaska,* 338 F.3d 1095 (9th Cir. 2003) (soft money contributions to political
     parties).

DEFENDANTS' BRIEF IN OPPOSITION          11
TO PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

1   *United,* "contribution limits . . ., which unlike limits on independent expenditures, have been

2   an accepted means to prevent *quid pro quo* corruption." *Citizens United,* 130 S. Ct. at 909.

3            Plaintiffs argue that "[f]or contributions to a recall campaign, as in other ballot measure

4   questions such as initiatives and referenda, there is no candidate to corrupt and so the campaign

5   cannot raise the specter of *quid pro quo* corruption." Mot. at 13.  However, the ultimate reality

6   of recall elections, unlike a ballot measure, directly involves real persons – the elected official

7   subject to the recall, the officers of the recall campaign, and, if the recall is successful, the

8   appointed replacement and the officials responsible for appointing the replacement.

9   Washington has a substantial and significant interest in ensuring that systems used to remove

10  an elected official and select a new official, or to finance these efforts, are adequately shielded

11  from corruption or the appearance of corruption.

12           Typically, elections fall into two categories:  candidate elections and ballot proposition

13  elections.  Under Washington's campaign contribution limits, contributions from individuals to

14  candidates or political committees associated with candidates are subject to a constitutionally

15  permissible $800 contribution limit per election ($1,600 total for primary and general election).

16  *See generally* RCW § 42.17.640.  Contributions to committees supporting or opposing ballot

17  propositions to enact legislation, on the other hand, are not subject to any contribution limits

18  because there are no candidates.  *Id.*

19           A recall election, however, is a hybrid that includes certain features associated with

20  both candidate and ballot proposition elections.  Ellis Decl. ¶ 57.  Some procedures for placing

21  a recall petition on the ballot are similar to procedures required to qualify a ballot measure,

22  including the gathering of voter signatures.  Because of this similarity, the Legislature and the

23  PDC have, at different times, categorized recall elections in their initial stages as a type of

24  ballot proposition.   RCW § 42.17.020(4); Ellis Decl. ¶¶ 57, 58.   While the process of

25  qualifying a ballot proposition for the ballot shares elements with the process for qualifying a

26  recall petition for the ballot, the subject matter of a ballot measure and the subject matter of a

DEFENDANTS' BRIEF IN OPPOSITION
TO PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

12

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 664-9006

recall petition are fundamentally different.  A ballot proposition is a means by which the electorate can directly enact legislation.  A recall election is a means of deciding if an elected official should continue to serve in the elected office.  Theoretically, proposed legislation is not subject to corruption or the appearance of corruption.[13]  A recall, however, involves the removal of an elected official from office, and if the recall is successful, the appointment of his or her replacement.  The elected official, his or her replacement, and the official(s) charged with appointing the replacement, are all persons who may be susceptible to corruption or the appearance of corruption, as are the persons on the committee sponsoring the recall.

The electorate understood this when it initially adopted RCW § 42.17.640(3), imposing contribution limits on campaigns seeking to recall state elected officials.  Indeed, Initiative 134 expressly states that its adoption was based, in part, upon citizens' concerns regarding corruption and the appearance of corruption in Washington's electoral processes.  *See* RCW § 42.17.610(2) ("Rapidly increasing political campaign costs have led many candidates to raise larger percentages of money from special interests with a specific financial stake in matters before state government.  This has caused the public perception that decisions of elected officials are being improperly influenced by monetary contributions.").  Similar concerns justify the Legislature's 2006 decision to extend contribution limits to local recall elections.  Ellis Decl. ¶¶ 50-51.

### 3. Contribution Limits Applicable To Recall Campaigns In RCW § 42.17.640(3) Advance An Important Government Interest By Preventing Corruption And The Appearance Of Corruption In Recall Elections

Washington State and its electorate have a long and well-documented history of concern regarding the corrosive effects corruption and the appearance of corruption can have on candidates, elected officials, and persons managing political campaigns when the power of

---

[13] Washington's experience with ballot measure sponsors suggests otherwise.  In *State ex rel. Washington State Public Disclosure Comm'n v. Permanent Offense,* 150 P.3d 568 (Wash. Ct. App. 2006), the officers of a ballot measure committee secretly compensated the campaign manager with campaign contributions passed through a shell corporation.  While receiving these secret payments, the manager told the public that his work on the ballot measure campaign was strictly voluntary.  *Id.* at 280-81.

DEFENDANTS' BRIEF IN OPPOSITION
TO PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

13

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 664-9006

1    wealthy individuals and special interests remains unchecked.  Ellis Decl. ¶¶ 19-26, 44-54.

2    Washington's adoption of the recall process in its Constitution at the turn of the last century

3    and, its subsequent adoption of campaign finance laws limiting campaign contributions in

4    recall elections, are a logical expression of this concern.  In light of recent national events, the

5    application of contribution limits to recall elections by the people and the Legislature appears

6    to be prescient, particularly given the modern reality of wealthy individuals and special

7    interests bankrolling efforts to recall elected officials they do not like.[14]

8         As discussed above, as they proceed recall elections are more closely analogous to

9    candidate elections when analyzing their susceptibility to corruption or the appearance of

10   corruption, because like candidate elections, candidate and recall elections ask the electorate to

11   decide a question about a person, rather than asking the electorate to legislate.   Not

12   surprisingly, Washington history indicates that recall elections can impact elected officials, and

13   their decisions.[15]   Indeed, "the mere potential for a recall can interfere with the duties of

14   officials."  Ellis Decl. ¶ 29 (*citing* Comment, Joshua Osbourne-Klein, *Electoral Recall in*

15   *Washington State & California:  California Needs Stricter Standards to Protect Elected*

16   *Officials from Harassment,* 28 Seattle U. L. Rev. 144, 163).[16]   While recall campaigns

17   frequently present themselves as local citizen efforts, the reality in jurisdictions that allow

18   unlimited contributions is that these efforts are bankrolled by wealthy individuals or special

19   interest groups who are unhappy with the elected official's performance and are "grass roots"

---

[14] *See* Ellis Decl. ¶ 30 for a summary of articles describing how unlimited campaign contributions have impacted recent recall elections throughout the nation.

[15] Seattle adopted a local recall process in 1906, and used the process to recall Mayor Hiram G. Gill in 1911.  Ellis Decl. ¶¶ 19, 22 (*citing* Farmer, at 31; Murray Morgan, *Skid Road: An Informal Portrait of Seattle* 176-177 (1982)).  That recall came about because the mayor wanted an "open town" (that permitted gambling, alcohol consumption, and prostitution), resulting in concerns by those who advocated a "closed town" (with none of those elements) and who believed the mayor was engaging in corrupt practices and condoning vices.  Ellis Decl. ¶ 22 (*citing* Morgan at 171, 177).  That is, economic as well as moral issues, prompted the recall effort.  The recall effort was successful and Mayor Gill was the first mayor to be recalled in the United States.  *Id.*  He is quoted as describing that in the recall the people "dis-elected me."  *Id.* (*citing* Morgan at 196).

[16] Even Plaintiffs recognize the risk of a recall opponent's potential for corruption through the recall process.  Mot. at 16-17.  Plaintiffs acknowledge that the subject of the recall may be "incompetent, corrupt, or arbitrary", thus rendering the official subject to the recall.  Mot. at 15.

DEFENDANTS' BRIEF IN OPPOSITION
TO PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

14

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 664-9006

1    in name only.[17]   The threat of a well-financed recall effort sponsored by a single wealthy

2    individual can be sufficient to unduly influence an elected official's decision-making, as well

3    as those who may seek to fill the vacancy.  A recent surge of state and local recall campaigns

4    prompted a senior fellow at the Wisconsin Policy Research Institute to observe that "For

5    anybody who thought that politicians are in thrall to special interests now, just wait until they

6    can get yanked out of office anytime they cross the big boys."  Ellis Decl. ¶ 29 (*Recall*

7    *Elections Surge in Local and State Governments,* Los Angeles Times, www.latimes.com,

8    June 22, 2011).

9         RDW contends that contribution limits on recall campaigns are unnecessary because

10   recall campaigns are not connected with a candidate or elected official who can be corrupted.

11   This argument disregards the fact that recall campaigns involve current elected officials, which

12   is why the contribution limits in RCW 42.17.640 also apply to them in a recall campaign.  This

13   argument also disregards the fact that a successful recall will result in a vacancy in an elected

14   office.  Not surprisingly, persons interested in holding the office of an elected official subject

15   to recall gravitate toward recall campaigns.  RDW is no exception.  Indeed, for example, two

16   of Washam's opponents in the 2008 election are serving as honorary co-chairs to the recall

17   campaign.  Ellis Decl. ¶ 38.  While Farris herself has not officially announced her interest in

18   assuming Washam's office, her comments to the press certainly leave that door open.  Ellis

19   Decl. ¶ 36.  All of these individuals, who are actively participating in the recall campaign,

20   could be corrupted or subject to the appearance of corruption if limits on contributions made

21   directly to the recall campaign were removed.[18]

22

23   ――――――――――――
       [17] For example, a newspaper editorial discussing an effort to recall the mayor of the City of Miami offered the
24   following description of the recall campaign:  "While that may conjure up the image of a grass-roots campaign to
       throw out a tyrant who raised taxes, consider the move to oust him was led by a billionaire former owner of the
25   Philadelphia Eagles who spent more than $1 million on the effort."  Ellis Decl. ¶ 30 (Editorial, *Approach Recall
       with Skepticism,* Journal Gazette, www.journalgazette.com, March 20, 2011).
       [18] The potential for corruption in this context is not hypothetical.  *See* footnote 9 (discussion of *Permanent
26   Offense).*

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 664-9006

1    Corruption or the appearance of corruption may also arise during the appointment

2    process if the recall is successful.  Recently, for example, former Illinois Governor Rod

3    Blagojevich was convicted on corruption charges related to his attempts to personally profit

4    from his power to appoint a replacement for the Senate seat vacated by President Obama.  Ellis

5    Decl. ¶¶ 31-32.  In this case, the Pierce County Council will make the appointment.  Ellis Decl.

6    ¶ 33.  Notably, one of the county council members has already declared his intent to run for the

7    Pierce County Assessor-Treasurer in the 2012 election.  Ellis Decl. ¶ 34.  Although council

8    members are apparently prohibited from filling a vacant seat from among their own ranks, this

9    county council member clearly has an interest in the success of the recall election and the

10   selection of the successor that goes beyond his duties as a county council member.  This

11   county council member has also posted comments on the RDW website discussing how

12   Washam's successor would be selected if the recall campaign was successful.  Ellis Decl. ¶ 35.

13   Plaintiffs contend that this case is controlled by case law holding that limits applied to

14   contributions to independent expenditure campaigns are unconstitutional because the recipient

15   of the contributions is not a candidate and, therefore, there is no risk of corruption or the

16   appearance of corruption.  Mot. at 11.  None of the three cases Plaintiffs rely upon involve a

17   recall election and, accordingly, provide little guidance on the issues here.  *See SpeechNow.org*

18   *v. FEC*, 599 F.3d 686 (D.C. Cir. 2010) (constitutional challenge to limit imposed upon

19   contributions to independent expenditure committee); *Long Beach Area Chamber of*

20   *Commerce v. City of Long Beach*, 603 F.3d 684 (9th Cir. 2010) (constitutional challenge to

21   limits imposed upon contributions to and expenditures by independent expenditure committee);

22   *Thalheimer v. City of San Diego*, __ F.3d ___, 2011 WL 2400779 (9th Cir. 2011) (same).

23   The *CFCG* case, which addresses the constitutionality of contribution limits imposed

24   upon a recall campaign, is also not helpful to Plaintiffs.  During oral argument, the City

25   conceded "that there is no evidence in the record of any corruption, or the appearance of

26   corruption" relating to the contribution limits imposed on recall elections in that case.  *Id.* at

DEFENDANTS' BRIEF IN OPPOSITION
TO PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

16

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 664-9006

653-54.  The factual record developed so far here, on the other hand, establishes a completely different story and the Defendants here make no such concession.  Finally, the Ninth Circuit was careful to note in *CFCG* that it was not saying a case can never be made for application of contribution limits to recall campaigns: "We make no statement about whether the City, on remand, will be able to develop and introduce evidence establishing a sufficiently important interest in limiting contributions by recall campaigns."  *Id.* at 654.  The Court stated that "following both Supreme Court and Ninth Circuit precedent, we again emphasize the importance of factual development."  *Id.* at 653.  Because the District Court did not do that, the appeals court remanded the matter "for further evidentiary development in accordance with this opinion."  *Id.* at 654.  As a result, an important campaign finance law like RCW § 42.17.640(3) should not be considered on an injunction motion in a preliminary proceeding, and certainly in the absence of the opportunity to provide this Court with more of a factual record.

**4.      The $800 Contribution Limit Is Reasonable And Narrowly Tailored**

Citing affidavits submitted by Farris and Mell, Plaintiffs contend that, in the context of recall elections, the "$800 limit creates an almost insurmountable barrier to effective campaigning" and that it constitutes "an impenetrable barrier to political change" by "magnify[ing] the advantages of incumbency."  Mot. at 19.  The limited information currently available without discovery, however, indicates that the vast majority of contributions RDW has received are substantially less than the $800 limit and that, despite the limit, RDW continues to actively solicit and receive contributions, make expenditures, and progress toward its goal of collecting sufficient signatures to qualify to appear on the ballot for the 2011 general election.  Perkins Decl. ¶¶ 7c, 7g; Anderson Decl. ¶ 12k.  Only one contributor is identified as wanting to make contributions in excess of the $800 limit.  She contends that she would contribute another $2,200 (for a total of $3,000) to RDW if the limits were not in place.  Mell Decl. ¶ 11.  Plaintiffs, however, have not offered any documentation regarding the committee's

DEFENDANTS' BRIEF IN OPPOSITION
TO PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

17

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 664-9006

1    budget or even an estimate regarding how much must be raised for the campaign to succeed.

2    Nor have they explained why they are constrained from seeking additional contributions from

3    new contributors or established contributors who have not given to the limit, including all of

4    their honorary co-chairs save one.  Under these circumstances, it is difficult to understand how

5    the inability to collect an additional $2,200 from a single source constitutes an unconstitutional

6    or "insurmountable barrier" to the campaign's success.

7          In any event, in analyzing a campaign finance law, this is an instance where the court

8    should look to the judgment and expertise of the Legislature and the people engaged in their

9    legislative power through direct democracy efforts.  *Citizens United,* 130 S. Ct. at 911 ("We

10   must give weight to attempts by Congress to seek to dispel either the appearance or the reality

11   of these influences.").  Indeed, the Supreme Court has recognized that it lacks a "scalpel to

12   probe" the adequacy of contribution levels and, therefore, cannot determine "with any degree

13   of exactitude the precise restriction necessary to carry out the statute's legitimate objectives."

14   *Randall,* 548 U.S. at 248 (quoting *Buckley,* 424 U.S. at 30).  Under such circumstances, the

15   Court held that a reviewing court should defer to a legislature, as "legislators have 'particular

16   expertise' in matters related to the costs and nature of running for office."  *Id.*  Continuing, the

17   Court recognized that these legislative judgments are entitled to an amount of "constitutional

18   leeway."  *Id.* at 263.

19         Moreover, the $800 limit for individuals ($1,600 for couples) per election at issue here

20   is substantially greater than the $200 limit at issue in *Randall*.  548 U.S. at 249.  It is also the

21   limit under which state and local candidates throughout Washington successfully manage their

22   campaigns.  RCW § 42.17.640; Anderson Decl. ¶ 14.  Accordingly, the constitutional concerns

23   triggered by the contribution limits in *Randall* are not present here.

24

25

26

1  **C.    Plaintiffs Are Collaterally Estopped From Challenging RCW § 42.17.640(3) to the
2         Extent It Relates to In-Kind Attorney Fees Incurred During the Appeal of the
         Sufficiency Order to the Supreme Court**

3         Plaintiffs complain that RCW §42. 17.640(3) "prevents professionals like Jeff Helsdon

4  and Tom Oldfield from volunteering their services to the recall campaign."  Mot. at 19.  On

5  April 25, 2011, however, RDW, in a stipulation signed by RDW counsel Helsdon, agreed that

6  legal fees related to the Supreme Court appeal did <u>not</u> constitute a contribution for purposes of

7  the Washington's campaign finance law.  Ellis Decl., Ex. H.  The stipulation further provided

8  that, upon issuance of an order by the PDC accepting the stipulation, RDW surrendered all

9  rights to appeal or to otherwise seek judicial review of the stipulation.  *Id.*  Farris attended the

10  April 28, 2011 hearing at which the Commission accepted the stipulation.  *Id.*

11         Under these circumstances, Plaintiffs should be estopped from challenging the

12  constitutionality of RCW § 42.17.640(3) to the extent it applies to in-kind legal services

13  provided during the appeal stage of the recall sufficiency order.  Mot. at 7-8, 9.[19]  As the

14  stipulation removes any possibility of enforcement of RCW § 42.17.640(3)'s limits with regard

15  to the sufficiency appeal attorney fees, Plaintiffs are unlikely to prevail on the merits of this

16  claim and issuance of a preliminary injunction on this issue would serve no purpose.[20]

17  **D.    Plaintiffs Fail To Establish Irreparable Harm**

18         A party seeking a preliminary injunction must also establish that they will likely suffer

19  irreparable harm.  *Winter*, 129 S. Ct. at 374-76.  "An injunction will not issue if the person or

20  entity seeking injunctive relief shows a mere 'possibility of some remote future injury,' or a

21  'conjectural or hypothetical' injury."  *Park Village Apartment Tenants Ass'n v. Mortimer*

22

---

23  [19] RDW, as the Respondent in the enforcement action, is one of the Plaintiffs here.  Farris is RDW's campaign
24  manager.  Oldfield & Helsdon was RDW's legal counsel during the enforcement hearing.  *Green v. Ancora-
    Citronelle Corp.*, 577 F.2d 1380, 1382 (9th Cir. 1978) (holding that a stipulated judgment may have collateral
    estoppel effect).
25  [20] The stipulation also impacts the irreparable harm analysis.  As the parties have stipulated that legal fees
    incurred during the appeal of the sufficiency order to the Supreme Court do not constitute in-kind contributions
26  for purposes of Washington's campaign finance laws, Plaintiffs cannot credibly argue that their ability to
    contribute these services were "chilled" or otherwise infringed.

DEFENDANTS' BRIEF IN OPPOSITION          19          ATTORNEY GENERAL OF WASHINGTON
TO PLAINTIFFS' MOTION FOR                            1125 Washington Street SE
PRELIMINARY INJUNCTION                                       PO Box 40100
                                                       Olympia, WA 98504-0100
                                                          (360) 664-9006

1   *Howard Trust*, 636 F.3d 1150, 1161 (9th Cir. 2011).

2   Plaintiffs contend that they will be irreparably harmed because the continued

3   enforcement of RCW § 42.17.640(3)'s contribution limits "affects their ability to collect

4   sufficient signatures in a short period of time to place the question of whether Assessor

5   Washam should be recalled on the ballot." Mot. at 20. However, a close examination of the

6   facts (to the extent they have been developed at this preliminary stage) establishes no

7   infringement of Plaintiffs' rights and any harm allegedly suffered is of their own making and

8   not clearly or fairly attributable to the contribution limits in RCW § 42.17.640(3).

9   **1.    Plaintiffs' Alleged Harm Is Hypothetical And Speculative As The Vast**
        **Majority of Their Contributors Have Given Substantially Less Than The**
10      **$800 Authorized Under The Statute**

11   Plaintiffs contend that the continued enforcement of RCW § 42.17.640(3)'s

12   contribution limit prevents them from gathering contributions in excess of $800 and, therefore,

13   interferes with their ability to qualify the recall petition for the ballot.[21] Mot. at 18-21. RDW's

14   campaign finance disclosure forms, however, reveal that the vast majority of contributions to

15   the RDW committee are for substantially less than $800. Perkins Decl. ¶ 7c. Of the 147

16   contributors documented in the filings as of July 11, 2011, only fifteen have made

17   contributions equal to the $800 limit. *Id.* Of these fifteen contributors, only one, Ms. Mell, has

18   come forward and indicated a desire to make contributions in excess of the $800 limit. The

19   impact, if any, is further reduced by the fact that Ms. Mell (and any other recall supporters)

20   was and is free to make unlimited expenditures in support of the Washam recall, provided

21   these expenditures are made independently from RDW. *See Buckley,* 424 U.S at 21-22

22   (contribution limits do not reduce the total amount of money available for political expression

23   

24   [21] RDW repeatedly refers to the short time it has to gather signatures. Mot. at 8 (lns. 4, 11, 16), 9 (lns. 2, 3), 20
     (lns. 14, 17). However, by August 31, 2011 (the date RDW says the signatures are due to the county auditor)
25   RDW will have had nearly six months to collect sufficient signatures for the recall. (Signature collection could
     not start until after the Supreme Court's March 3, 2011 order). Ellis Decl. ¶ 8; Farris Decl. ¶ 40. This is a
26   considerably longer period than most candidates have who file and run for local positions. *See*
     http://www.sos.wa.gov/elections/calendar.aspx.

1  because contributors are free to make independent expenditures in excess of the limits); RCW

2  § 42.17.100; Ellis Decl. ¶ 89.

3       In short, Plaintiffs' freedom to exercise their First Amendment rights remains intact,

4  regardless of whether they receive injunctive relief.  They remain free to solicit additional

5  contributions from the vast majority of their current contributors, as well as to seek new

6  sources of funding from the community at large.   Under these circumstances, Plaintiffs'

7  contention that enforcement of RCW § 42.17.640(3) pending the resolution of this lawsuit will

8  prevent them from raising funds necessary to hire signature gatherers is remote and

9  hypothetical, at best, and falls far short of the clear showing of harm necessary to prevail.

10       **2.      Plaintiffs Chose <u>Not</u> To Hire Signature Gatherers And, Therefore, Any Harm They May Be Suffering Is Of Their Own Making**

11

12       Plaintiffs contend that they will suffer irreparable harm because RCW § 42.17.640(3)'s

13  limits will prevent them hiring signature gathers and that hiring signature gatherers is the only

14  way they can collect sufficient signatures to qualify for the ballot.  Mot. at 20-21.  What

15  Plaintiffs do not disclose is the fact that, until recently, RDW purposefully chose <u>not</u> to hire

16  signature gatherers.  Anderson Decl. ¶¶ 12e, 12f.  Based on the limited information available

17  without discovery, it appears that Plaintiffs, at the outset of the campaign, made a strategic

18  decision to expend their funds on a newspaper insert, rather than hire signature gatherers

19  during the first several months of the campaign.  Anderson Decl. ¶ 12f.  When Plaintiffs'

20  strategy apparently resulted in fewer signatures than they wanted, Plaintiffs filed this lawsuit

21  and, only then began complaining that RCW § 42.17.640(3)'s contribution limits were

22  preventing them from achieving their goal.  Anderson Decl. ¶ 12h.  Given Plaintiffs' own

23  decisions on how to proceed with their campaign strategy, including in the signature gathering

24  efforts to date, Plaintiffs' contention that there is a direct correlation between their alleged

25  inability to collect signatures and Section 640(3)'s contribution limits is extremely speculative.

26  The possibility that Plaintiffs will fail to collect sufficient signatures to place the recall on the

DEFENDANTS' BRIEF IN OPPOSITION
TO PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

21

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 664-9006

1  ballot arises from Plaintiffs' campaign decisions concerning expenditures, not the contribution

2  limits imposed by RCW § 42.17.640(3).

3  **E.    Balance of Equities Tip Sharply in Favor of the People Who Designed**
   **Washington's Recall Election Campaign And Campaign Finance Systems; Not**
4  **This Single Recall Committee**

5      Plaintiffs contend that the balance of equities tips in their favor because imposition of

6  the injunction will cause the State to "suffer no harm at all," while enjoining the enforcement

7  of RCW § 42.17.640(3) is "of overwhelming importance to Plaintiffs."  Mot. at 21-22.

8  Plaintiffs, however, misstate the harm that will result from imposition of an injunction and

9  grossly underestimate the magnitude of the harm that will result.  "[A] state suffers irreparable

10  injury whenever an enactment of its people or their representatives is enjoined." *Coalition For*

11  *Economic Equity v. Wilson,* 122 F.3d 718, 719 (9th Cir. 1997); *see also Burford v. Sun Oil Co.,*

12  319 U.S. 315, 318 (1943) ("[I]t is in the public interest that federal courts of equity should

13  exercise their discretionary power with proper regard for the rightful independence of state

14  governments in carrying out their domestic policy.") (Internal quotation marks omitted).

15  While Plaintiffs couch their analysis in terms of harm to the State and its resources, the actual

16  harm resulting from imposition of an injunction will be to the people of Washington and to the

17  integrity of the campaign finance and recall systems devised and adopted by the people and

18  their elected representatives.  This harm is compounded by the fact that Plaintiffs delayed

19  seeking relief until the heart of the campaign season, thereby threatening to upset the orderly

20  administration of elections and manufacturing a false sense of urgency to support their claims.

21  The issuance of an injunction changing the status quo by prohibiting the enforcement of a duly

22  adopted campaign finance law in the midst of the election season is not an issue to be taken

23  lightly and clearly is not an issue without consequence to the electorate.

24      Enjoining enforcement of RCW § 42.17.640(3) is contrary to the public interest.  "In

25  exercising their sound discretion, courts of equity should pay particular regard for the public

26  consequences in employing the extraordinary remedy of injunction." *Winter,* 129 S. Ct. at

DEFENDANTS' BRIEF IN OPPOSITION          22          ATTORNEY GENERAL OF WASHINGTON
TO PLAINTIFFS' MOTION FOR                                    1125 Washington Street SE
PRELIMINARY INJUNCTION                                              PO Box 40100
                                                              Olympia, WA 98504-0100
                                                                    (360) 664-9006

1    376-77 (quotation marks and citation omitted).  Whether contribution limits should extend to

2    recall campaigns, and how, is a public policy issue that should be left to the Legislature or the

3    people acting in their legislative capacity, who are in the best position to respond to Plaintiffs'

4    concerns about the design of recall campaigns.  *See Randall,* 528 U.S. at 248.[22]  Removing

5    decisions regarding how to appropriately regulate elections from the legislature is not in the

6    public interest, particularly when the decision to enjoin enforcement constitutes a change in the

7    status quo and will be made before the parties have had the opportunity to conduct discovery

8    and fully brief the legal and factual issues.

9        The public also has an important interest in the orderly conduct of elections.

10   Disrupting a campaign finance system shortly before ballots are mailed for the August 16,

11   2011 primary elections[23] and enjoining a campaign finance law without discovery and full

12   development of the factual and legal issues, is not in the public interest and the public will be

13   harmed as a result.  Plaintiffs' failure to clearly establish the other three elements necessary for

14   an injunction also heightens the conclusion that such relief is not in the public interest.

15       Plaintiffs contend that the equities tip in their favor because enjoining the enforcement

16   of RCW § 42.17.640(3)'s contribution limits is of "overwhelming importance to Plaintiffs."

17   Mot. at 21.  The factual record, to the extent it has been developed, however, demonstrates

18   otherwise.  Plaintiffs notified the PDC that they were prepared to file a lawsuit challenging

19   RCW § 42.17.640(3) as early as mid-January 2011.  At that time, they knew the recall petition

20   was on appeal to the Washington Supreme Court and that they would be unable to collect

21   signatures until after the Supreme Court issued its ruling.  Plaintiffs, however, did not file the

22   instant lawsuit seeking relief from RCW § 42.17.640(3)'s limits until June 7, 2011, nearly five

23   months from the date Plaintiffs first threatened to file suit, over three months after the Supreme

24

25   [22] Notably, Plaintiffs appear to have not approached the Legislature, nor have they approached the Commission, seeking any changes to the statutes and regulations that describe contribution limits in recall campaigns, volunteer services, or in-kind contributions.  Ellis Decl. ¶¶ 67, 68, 73, 74.

26   [23] Ballots for the August 16, 2011 are scheduled to be mailed on July 29, 2011.  *See supra* fn. 16.

DEFENDANTS' BRIEF IN OPPOSITION
TO PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

23

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 664-9006

1  Court authorized the recall campaign to go forward in early March, and two months after the

2  PDC enforcement proceeding concluded.  They then waited another two weeks to file this

3  motion.  Surely, if this issue was truly of "overwhelming importance" to the recall campaign,

4  Plaintiffs would have taken steps to resolve it sooner rather than waiting until the last moment

5  to file their complaint and move for a preliminary injunction.  Plaintiffs should not be rewarded

6  for their choice to delay filing this motion until the summer of 2011.

7      Finally, Plaintiffs' contention that an injunction should be issued based on an assertion

8  that no public interest is associated with enforcing an unconstitutional statute presupposes a

9  determination on the merits that RCW § 42.17.640(3) is unconstitutional.  The record here is

10  incomplete and the facts and law Plaintiffs offer are far from clear to warrant such action by

11  this Court.  *CFCG,* 474 F.3d at 654.

12              **IV.    CONCLUSION**

13      For the reasons set forth above, Defendants respectfully request that the court issue an

14  order denying Plaintiff's Motion for a Preliminary Injunction.

15      DATED this 11th day of July, 2011.

16                    ROBERT M. MCKENNA
                      Attorney General
17

18                    s/ Linda A. Dalton
                      LINDA A. DALTON, WSBA #15467
19                    Senior Assistant Attorney General
                      s/ H. Bruce Marvin
20                    H. BRUCE MARVIN, WSBA #25152
                      Assistant Attorney General
21                    Attorneys for Defendants

22

23

24

25

26

DEFENDANTS' BRIEF IN OPPOSITION          24
TO PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION