1
                                                             Honorable Robert J. Bryan

2

3

4

5

6

7
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

8

9
ROBIN FARRIS, et al.,

10
                                Plaintiffs,

No. 3:11-cv-05431

11
      v.

BRIEF OF AMICUS CURIAE
WISCONSIN DEMOCRACY
CAMPAIGN IN OPPOSITION TO
PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

12
DAVE SEABROOK, et al.,

13
                            Defendants.

14

15
## I.    IDENTITY AND INTEREST OF AMICUS CURIAE WISCONSIN DEMOCRACY CAMPAIGN

16

17
The Wisconsin Democracy Campaign ("WDC") is a nonprofit, nonpartisan political

18
watchdog group dedicated to clean government.  WDC seeks to protect the values of honesty,

19
fairness, transparency, accountability, citizen participation, competition, and respect for

20
constitutional rights and rule of law.  WDC works for campaign finance reform, and tracks

21
financing in state politics, including the financing of Wisconsin's current recall campaigns.

22
## II.    INTRODUCTION AND SCOPE

23

24
This brief focuses on a single issue: whether large monetary contributions to recall

25
campaigns implicate corruption or the appearance of corruption.  Plaintiffs argue that there are

26
no concerns over corruption in the recall context, but they fail to address the demonstrated ways

BRIEF OF AMICUS CURIAE - 1
Case No. 3:11-cv-05431

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

in which corruption and the appearance of corruption are implicated by large monetary contributions to recall campaigns.  WDC respectfully provides the Court with some of this voluminous evidence and shows that such evidence supports limits on contributions to recall campaigns.  Plaintiffs' motion for a preliminary injunction should be denied.

### III.   STATEMENT OF LAW

**A.**   ***Buckley v. Valeo***:  **Preventing Corruption and the Appearance of Corruption**

The Supreme Court has identified one paramount governmental interest that justifies campaign contribution limits: **preventing corruption** and **the appearance of corruption**.  In *Buckley v. Valeo*, 424 U.S. 1, 96 S. Ct. 612 (1976), the Supreme Court upheld a $1,000 contribution limit imposed upon federal election campaigns, notwithstanding the resultant restrictions on contributors' freedom of association.

The Court began by acknowledging a fundamental difference in character between **contributions** and **independent expenditures**, noting that a restriction on expenditures "necessarily reduces the quantity of expression," but that "[b]y contrast . . . a limitation upon the amount that any one person or group may contribute to a candidate or political committee entails only a marginal restriction upon the contributor's ability to engage in free communication."  424 U.S. at 19, 20.  That is because a contribution "serves as a general expression of support . . . but does not communicate the underlying basis for the support," and a limit on contributions "does not in any way infringe the contributor's freedom to discuss candidates and issues."  *Id.* at 21.

The Court acknowledged that contributions do play an "important role . . . in financing political campaigns," and made clear that contributions limits must not "prevent[] candidates and political committees from amassing the resources necessary for effective advocacy."  *Id.*  But contribution limits that "merely [] require candidates and political committees to raise funds

BRIEF OF AMICUS CURIAE - 2
Case No. 3:11-cv-05431
K:\2969000\01038\22566_TVF\22566P203I

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

1  from a greater number of persons and [] compel people who would otherwise contribute amounts

2  greater than the statutory limits to expend such funds on direct political expression" do not run

3  afoul of the First Amendment.  *Id.* at 22.  The test of a contribution limit, as determined by the

4  Court and applied consistently since *Buckley*, is whether "the State demonstrates a sufficiently

5  **important interest** and employs means **closely drawn** to avoid unnecessary abridgment of

6  associational freedoms."  *Id.* at 25 (emphases added); *see also, e.g.*, *Arizona Free Enter. Club's*

7  *Freedom Club PAC v. Bennett*, __ S. Ct. __, 2011 WL 2518813, at *9 (June 27, 2011) ("[W]e

8  have subjected strictures on campaign-related speech that we have found less onerous to a lower

9  level of scrutiny and upheld those restrictions.").

10      One extremely important governmental interest that is furthered by contribution limits,

11  and which repeatedly has been acknowledged and respected by the Supreme Court, is the

12  prevention of **corruption** and/or the **appearance of corruption**.  *See Buckley*, 424 U.S. at 27-

13  28; *see also, e.g.*, *Nixon v. Shrink Missouri Gov't PAC*, 528 U.S. 377, 394-95, 120 S. Ct. 897

14  (2000) ("[T]here is little reason to doubt that sometimes large contributions will work actual

15  corruption of our political system, and no reason to question the existence of a corresponding

16  suspicion among voters."); *Citizens United v. Fed. Election Comm'n*, 130 S. Ct. 876, 908 (2010).

17      In *Buckley*, the Court acknowledged that allowing large financial contributions to

18  candidates engenders *quid pro quo* corruption, making candidates more likely to make

19  inappropriate promises to special interests—compromising their independent judgment and duty

20  to constituents—in order to obtain bribes or ensure victory.  The Court concluded that

21  "[a]lthough the scope of such pernicious practices can never be reliably ascertained" (given that

22  such corruption is irregular and often goes undetected), "the deeply disturbing examples

23  surfacing after the 1972 [presidential] election demonstrate that the problem is not an illusory

BRIEF OF AMICUS CURIAE - 3
Case No. 3:11-cv-05431

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

one." *Id.* at 27 & n.28 (citing the "Court of Appeals' opinion . . . discuss[ing] a number of the abuses uncovered"). The Court of Appeals in *Buckley*, citing various Congressional hearings and reports, found that "[t]he record before Congress was replete with specific examples of improper attempts to obtain governmental favor in return for large campaign contributions." 519 F.2d 821, 839 n.37 (D.C. Cir. 1975).[1] The government's weighty interest had been established because the examples cited were sufficient to show that the problem of corruption based on large contributions "is not an illusory one." 424 U.S. at 27.

The Court also held that "[o]f **almost equal concern** . . . is the impact of the appearance of corruption stemming from public awareness of the opportunities for abuse inherent in a regime of large individual financial contributions." *Id.* (emphasis added). More specifically, the Court held that "Congress could legitimately conclude that the avoidance of the appearance of improper influence is also critical if confidence in the system is not to be eroded to a disastrous extent." *Id.* (internal quotations and ellipses omitted); *see also Nixon*, 528 U.S. at 390 ("Leave the perception of impropriety unanswered, and the cynical assumption that large donors call the tune could jeopardize the willingness of voters to take part in democratic governance.").

Finally, the *Buckley* Court rejected arguments that the contribution limits in question were unnecessary and overbroad. The Court first concluded that the availability of "bribery laws and narrowly drawn disclosure requirements"—admittedly less restrictive means of dealing with corruption—did not invalidate contribution limits. Bribery laws capture "only the most blatant

---

[1] One such example arose after dairy organizations pledged $2 million to President Nixon for his 1972 campaign. After a meeting with the dairy organization representatives, Nixon "decided to overrule the decision of the Secretary of Agriculture and to increase price supports," and "[i]n the meetings and calls that immediately followed . . . the dairymen were informed of the likelihood of an imminent increase and of the desire that they reaffirm their $2 million pledge." *Id.* at 839 n.36 (citing a Congressional report); *see also, e.g., id.* at 840 n.38 (ambassador offered a more prestigious post in return for a $100,000 contribution). The court found it "not material" whether Nixon's decision was truly represented to be conditioned upon the reaffirmation of the pledge—the shocking details in the report, and the unavoidable specter of corruption, were sufficient to establish the government's important interest.

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

1  and specific attempts," and "Congress was surely entitled to conclude that disclosure was only a
2  partial measure . . . ." *Id.* at 27-28. The Court rejected the argument that contribution limits are
3  unconstitutional because they invariably restrict even those contributors not seeking improper
4  influence. Given the practical limitations involved in detecting and preventing corruption, such
5  broad measures are a necessity. *See, e.g.*, *Citizens United v. Fed. Election Comm'n*, 130 S. Ct.
6  876, 908 (2010) (noting that such contribution limits necessarily "are preventative, because few
7  if any contributions to candidates will involve *quid pro quo* arrangements"). "Not only is it
8  difficult to isolate suspect contributions," the *Buckley* Court noted, "but, more importantly,
9  Congress was justified in concluding that the interest in safeguarding against the appearance of
10  impropriety requires that the opportunity for abuse inherent in the process of raising large
11  monetary contributions be eliminated." *Id.* at 30.
12
13          In sum, the Court in *Buckley* (1) held that contribution limits are constitutional so long as
14  they are closely drawn to further an important governmental interest; (2) found that allowing
15  unlimited monetary contributions to candidates and their committees does engender corruption
16  and the appearance of corruption; and (3) concluded that contribution limits are constitutional
17  because they further the important governmental interest of preventing corruption and the
18  appearance of corruption.
19
20          **B.  *Nixon v. Shrink Missouri Gov't PAC*:  Establishing the Risk of Corruption**
21          The government's interest in preventing corruption must be established in any given case
22  in order to justify particular campaign contribution limits. But the burden of showing that large
23  monetary contributions to candidates engender corruption and/or the appearance of corruption is
24  easily met. In *Nixon*, the Supreme Court upheld Missouri's in-state contribution limits, ranging
25
26

*Id.* at 839 n.37.

BRIEF OF AMICUS CURIAE - 5
Case No. 3:11-cv-05431

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

from $250 to $1000, applicable to campaigns for various state offices.  528 U.S. at 381.  The Court noted that "[t]he quantum of empirical evidence needed" to justify contribution limits "will vary up or down with the novelty and plausibility of the justification raised," but "the dangers of large, corrupt contributions and the suspicion that large contributions are corrupt are neither novel nor implausible."  *Id.* at 391 (citing *Buckley*).  In fact, the Court held that the evidence in *Buckley* could be used to justify the corruption concerns in *Nixon*, because that evidence was "relevant to the problem" being addressed.  *Id.* at 393 n.6 (citing *Renton v. Playtime Theaters, Inc.*, 475 U.S. 41, 51-52, 106 S. Ct. 925 (1986)); *see also id.* at 394-95.

The Court also noted, approvingly, that "[t]he District Court cited newspaper accounts of large contributions supporting inferences of impropriety."  *Id.* at 393.  One of those reports, for example, questioned a state treasurer's decision to use a particular bank for official business, given that the bank had contributed $20,000 to the treasurer's campaign.  *Id.*  Such public reporting and awareness of questionable campaign contributions to candidates, in conjunction with the well-established connection between large financial contributions and corruption, was sufficient to establish Missouri's interest in imposing campaign contribution limits.  *See id.* at 390-95.  The Supreme Court thus demonstrated the important role that newspaper and other media accounts can play in revealing corruption and the appearance of corruption.

## C. *Citizens for Clean Gov't v. City of San Diego*: The Importance of a Factual Record and Context Regarding Recall Campaigns

The issue before the Court is one of first impression.  No court has applied the rules set forth in *Buckley* and *Nixon* to a developed factual record regarding recall campaigns.  The importance of a developed factual record was underscored by the Ninth Circuit's opinion in *Citizens for Clean Gov't v. City of San Diego*, 474 F.3d 647 (9th Cir. 2007).  There, the City of San Diego defended its limits on contributions to recall campaigns with "hypotheticals,

BRIEF OF AMICUS CURIAE - 6
Case No. 3:11-cv-05431

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

accompanied by vague allusions to practical experience," and conceded that "there [was] **no evidence** in the record of any corruption, or the potential for corruption, in the recall context." *Id.* at 654 (emphasis added).[2]  The Ninth Circuit remanded for factual development, and made "no statement about whether the City, on remand, [would] be able to develop and introduce evidence establishing a sufficiently important interest in limiting contributions to recall campaigns."  *Id.*

To assist the Court, Wisconsin Democracy Campaign, as amicus curiae, respectfully submits evidence on which the Court can and should rely.  *See United States v. E. I. du Pont de Nemours & Co.*, 366 U.S. 316, 346, 81 S. Ct. 1243 (1961) (noting that "amici also presented evidence"); *Ashland v. Ling-Temco-Vought, Inc.*, 711 F.2d 1431, 1440 (9th Cir. 1983) ("[I]t would be permissible for the trial court to take evidence of accident statistics such as the ones amici append to their brief."); *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, No. CV 01-640RE, 2005 WL 878602, at *4 (D. Or. Apr. 8, 2005).

**D.**     *Citizens United v. Fed. Election Comm'n*: **The Important Distinction Between Independent Expenditures and Contributions Linked to Campaigns**

In *Citizens United*, the Supreme Court clarified the contours of the corruption interest established in *Buckley* and *Nixon*.  Specifically, the Court emphasized that independent expenditures—expenditures made in the "absence of prearrangement and coordination . . . with [a] candidate or his agent"—do not give rise to corruption or the appearance of corruption.  130 S. Ct. at 909 (quoting *Buckley*).  The Court relied in part on its conclusion that obtaining mere

---

[2] In its brief to the Ninth Circuit, the City of San Diego hypothesized, without support or explanation, that large contributions to a recall campaign "would inure to the benefit of the candidates vying to replace the target of the recall," or in other words, that such contributions would engender corruption merely by swaying the election. Declaration of Taki V. Flevaris in Supp. Amicus Br., ¶ 2, Ex. A (Appellee's Br., *Citizens for Clean Gov't*, 2005 WL 1789897, at *15 (Apr. 11, 2005)).  The notion that large expenditures can engender corruption merely by swaying an election and securing "influence over or access to elected officials" has since been rejected by the Supreme Court. *Citizens United v. Fed. Election Comm'n*, 130 S. Ct. at 910; *see also infra*, Section III(D).  Thus, the City of San

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

"influence over or access to elected officials" does not implicate corruption, and that "[t]he appearance of [such] influence or access . . . will not cause the electorate to lose faith in our democracy." *Id.* at 910 ("Democracy is premised on responsiveness." (internal quotations omitted)).  The Court also rested its holding in large part upon the expansive 100,000-page record it had reviewed in *McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 124 S. Ct. 619 (2003), noting that the *McConnell* record contained **no examples** of corruption or the appearance of corruption in the distinct context of independent expenditures.  *See Citizens United*, 130 S. Ct. at 910.  One implication of the Court's holding in *Citizens United* is that contributions to committees operating completely independently from any candidates or elected officials do not implicate corruption or the appearance of corruption.  In sum, insofar as the government seeks to impose campaign contribution limits in order to prevent corruption and/or the appearance of corruption, such limits may be applied if prearrangement and coordination with candidates or elected officials is directly or indirectly involved—as has shown to be the case in a vast number of recall campaigns, throughout the United States.

## IV.   STATEMENT OF THE ISSUE

Whether prearrangement and coordination with candidates or elected officials is implicated in the context of large monetary contributions to recall campaigns, therefore implicating corruption or the appearance of corruption, and justifying contribution limits.

## V.   ARGUMENT

### A.   The History and Context of Recall Campaigns

The use of recalls, a somewhat controversial form of "direct democracy," arose in the Western United States in the early 1900s.  *See* Declaration of Taki V. Flevaris in Supp. Amicus

---

Diego's barebones theory is no longer viable, and is not asserted here.

BRIEF OF AMICUS CURIAE - 8
Case No. 3:11-cv-05431
K:\2969000\01038\22566_TVF\22566P203I

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

Br. ("Flev. Decl."), ¶ 3, Ex. B (Rachel Weinstein, *You're Fired!, The Voters' Version of 'The Apprentice': An Analysis of Local Recall Elections in California*, 15 S. CAL. INTERDISC. L.J. 131, 134-35 (2005).  Proponents believed "that the recall would provide them with a powerful tool to threaten state or local officials who were being controlled by wealthy interest groups."  *Id.* at 135.  Los Angeles was the first major locality to adopt the recall in 1903.  *Id.* at 136.  A Los Angeles councilman was successfully recalled the following year.  *Id.*  Other California cities then began to adopt the recall (such as San Francisco in 1907), and Oregon adopted the statewide recall in 1908.  *Id.* at 136.  California followed suit in 1911, followed by Washington in 1912; the adoption of the recall eventually spread to non-western states, such as Wisconsin, Louisiana, and Georgia.  *Id.* at 137.  To date, at least 36 states allow for recall of local officials.  *Id.* at 138.  And approximately three-fourths of all recall elections occur at the city council or school board level.  *Id.*

The parameters of the recall vary from state to state.  *Id.* at 139-40; *see also* Flev. Decl., ¶ 4, Ex. C (National Conference of State Legislatures, *Recall of State Officials*, Apr. 5, 2011); ¶ 5, Ex. D (National Conference of State Legislatures, *Recall of Local Officials*, Feb. 28, 2011).  In general, a recall involves the filing of a petition (often detailing the grounds for the recall), the gathering and verification of sufficient signatures in support, and the holding of a special election to determine whether the challenged official will be recalled.  State recall systems vary according to when a recall may be commenced; whether the petition is subject to judicial review; whether particular grounds, such as malfeasance, must be alleged and/or satisfied; the time limit within which to gather signatures; and the method by which resulting vacancies are filled until the next regular election (whether by concurrent vote, appointment, and/or by a subsequent and separate special election).  *See* Flev. Decl., Exs. B, C, D.

BRIEF OF AMICUS CURIAE - 9
Case No. 3:11-cv-05431

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

The use of the recall is on the rise.  *See, e.g.*, Flev. Decl., ¶ 6, Ex. E (Joshua Spivak, *Trend toward recall efforts on the rise for cities, states*, OMAHA WORLD-HERALD, Dec. 1, 2010) ("Recalls have exploded in growth in recent years.").  And many recall campaigns have been successful.  *Id.*  The most dramatic use of the recall to date is now occurring in Wisconsin, where nine state senators (six Republicans and three Democrats) are facing recall elections this month because of events surrounding legislation that curbs bargaining rights for Wisconsin's public employees.  *See* Flev. Decl., ¶ 7, Ex. F (CNN Wire Staff, *Wisconsin battle shifts to recall votes*, CNN.COM, June 15, 2011).  These Wisconsin recall elections have received national attention and involvement.  For example, a concert recently was held in Seattle in order to raise support for the recall efforts.  *See* Flev. Decl., ¶ 8, Ex. G (David Groves, *Seattle concert Saturday to benefit WI recall*, THESTAND.ORG, June 16, 2011).

The recent events in Wisconsin show that "the world of recall politics" has become just another tool in partisan electioneering for office.  Flev. Decl., ¶ 9, Ex. H (Daniel Bice, *GOP planning to field spoilers for all recalls*, MILWAUKEE JOURNAL SENTINEL, June 6, 2011).  The Republican Party is lining up "sham candidates" to run in Democratic primaries, in order to delay the eventual recall elections.  *Id.*  (The Democrats allegedly pulled a similar maneuver in a prior election.  *Id.*)  The resulting cost to taxpayers in the coming elections will be over $400,000.  Flev. Decl., ¶ 10, Ex. I (Emma Roller & Patrick Marley, *Expense of fake Democrats in primaries will top $400,000*, MILWAUKEE JOURNAL SENTINEL, June 13, 2011).  The Democrats are responding by running multiple candidates of their own, in order to ensure no surprise changes in scheduling.  *Id.*  The entire escapade is turning into a "political arms race." *Id.*  Indeed, senators targeted for recall elections have raised more than $1.3 million in less than four months.  Flev. Decl., ¶ 11, Ex. J (Wisconsin Democracy Campaign, *Special Interests*

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

*Investing Big in Recall Targets*, WISDC.ORG, May 5, 2011).

The Wisconsin recall campaigns have exposed some of the more pernicious dangers in unlimited contributions to recall campaigns. Because contribution limits on incumbents in Wisconsin are lifted from the time that a recall committee registers until a recall election is ordered, targeted senators have been able to receive huge campaign donations in recent months, **while they were writing the state budget**. Flev. Decl., ¶ 12, Ex. K (Jason Stein & Patrick Marley, *Recall incumbents were allowed to receive unlimited donations while writing budget*, MILWAUKEE JOURNAL SENTINEL, July 6, 2011). Wisconsin Democracy Campaign also recently discovered that some of these targeted senators failed to disclose required financial information concerning campaign contributors who gave them more than $50,000, thereby raising serious questions regarding corrupting influences. Flev. Decl., ¶ 13, Ex. L (Wisconsin Democracy Campaign, *WDC Files Complaints Against Recall Targets*, WISDC.ORG, June 7, 2011).

Nationally, many recall campaigns have been marred by corruption and/or the appearance of corruption. In Michigan in 2007, "[r]etail giant Meijer secretly funded a plan to orchestrate [a] recall of Acme Township's elected officials," "paid a public relations firm at least $30,000 in a failed effort to remove Acme's board after years of zoning disputes," and "used local residents as figureheads in the recall." Flev. Decl., ¶ 14, Ex. M (Brian McGillivary, *Meijer's Secret Plan*, TRAVERSE CITY RECORD-EAGLE, Dec. 23, 2007).

In Lafayette, Oregon, in 2010, resident Trevor Higby filed two separate recall petitions to recall councilors Dean Rhodes and Bob Cullen. Flev. Decl., ¶ 15, Ex. N (NewLafayette.org, *Citizen files recall*, Apr. 8, 2010). Higby was accused of simply implementing the mayor's agenda as a figurehead, and seeking to shift the balance of power on the city council by getting himself appointed to a vacant position. *See id.* ("Trevor it doesn't help your cause when you go

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

around town telling anyone who will listen that you will be the next new city councilmen [sic].”); Flev. Decl., ¶ 16, Ex. O (NewLafayette.org, *Former Mayor Don Leard says "No" to Recall*, June 11, 2010) ("The recall is about power and agendas."); *id.* ("You have got to be a complete idiot if you can't figure it out.  If one of them is recalled the Mayor will appoint Trevor Higby to fill the spot.  Then the balance has been shifted . . . .  They are full of it!").  Higby denied having any interest in a council position, and asserted that his recall petition was simply "about doing the right thing."  Flev. Decl., Ex. O; *see also* Ex. N ("Higby added, 'I am not interested in politics in the least . . . .'").  The recall campaign was successful.  Flev. Decl., ¶ 17, Ex. P (NewLafayette.org, *Cullen, Rhodes ousted from council in landslide*, June 29, 2010).  Despite his indignant protestations that his recall efforts were about "doing the right thing" and his lack of any interest in a council position, by March of 2011 Higby was a member of the city council.  *See* Flev. Decl., ¶ 18, Ex. Q (NewLafayette.org, *Councilor Trevor Higby resigns*, Mar. 10, 2011).

In Ridgefield, New Jersey, in 2010, local Republican chairman Robert Avery filed a petition to recall Democratic mayor Anthony Suarez, who was facing federal prosecution on corruption charges.  Flev. Decl., ¶ 19, Ex. R (Shawn Boburg, *Ridgefield mayor narrowly avoids recall, early results show*, NORTHJERSEY.COM, Aug. 17, 2010).  Avery closely coordinated the pro-recall campaign with the frontrunner replacement candidate Warren Vincentz.  The coordination was obvious, and one citizen stated that "[i]t started to smell like the Republicans just looking for an advantage . . . ."  Flev. Decl., ¶ 20, Ex. S (Richard Perez-Pena, *A Town Touched by Scandal Withholds Judgment*, NEW YORK TIMES, Aug. 18, 2010); *see also* Flev. Decl., ¶ 21, Ex. T (Max Pizarro, *At their makeshift HQ, Vincentz supporters stunned*, POLITICKERNJ.COM, Aug. 17, 2010).  Suarez survived the recall election, and also was found not

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

1   guilty.  Flev. Decl., ¶ 22, Ex. U (Joe Ryan, *Ridgefield Mayor Anthony Suarez found not guilty on*

2   *federal corruption charges*, NJ.COM, Oct. 28, 2010).[3]

3          As these examples (and the voluminous examples below) all show, the "world of recall

4   politics" has all the trappings of politics generally.  And in particular, because elected offices and

5   replacement candidates are involved in recall campaigns, such campaigns are equally susceptible

6   to manipulation and corruption through large contributions.

7          **B.     Recall Campaigns Involve Potential Replacement Candidates**

8          Allowing large financial contributions to recall campaigns implicates the specter of

9   corruption because recall campaigns are heavily tied up with **elected offices** (as opposed to

10  particular legal issues), and, in fact, tend to be associated strongly with (eventual) **replacement**

11  **candidates**.  As shown above, the campaign to recall Anthony Suarez was working together with

12  the frontrunner to replace Suarez.  Likewise, Trevor Higby falsely disclaimed an intention to be

13  appointed to the Lafayette, Oregon, City Council, but he nevertheless ended up on the council

14  after spearheading a successful recall campaign.  There is no shortage of examples demonstrating

15  the strong connection between recall campaigns and replacement candidates:

16

17

18  • In **Wildwood, New Jersey**, in January 2009, a recall committee was formed to pursue the

19     recall of Mayor Ernie Troiano Jr. and Commissioner Bill Davenport; John Roat was a

20     founder and member of the recall committee.  Flev. Decl., ¶ 24, Ex. W (Lauren Suit,

21     *Recall Committee Plans 'Door to Door' Campaign*, CAPE MAY COUNTY HERALD, Jan. 9,

22     2009).  By November, Mr. Roat was slated to appear on the ballot in the recall election.

23

24

25  _____

26  [3] There were other alleged improprieties.  For example, Suarez reported complaints from some residents who said
    they were "duped by the petitioners" into signing the recall petition.  Flev. Decl., ¶ 23, Ex. V (Matthew Van Dusen,
    *Ridgefield Republicans file recall petition against Mayor Anthony Suarez*, NORTHJERSEY.COM, Mar. 29, 2010).

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

Flev. Decl., ¶ 25, Ex. X (Trudi Gilfillian, *Wildwood candidates in recall election meet for 'job interview'*, PRESSOFATLANTICCITY.COM, Nov. 24, 2009).

- In **Nashville, Michigan**, in August 2009, Jamie Hollin led the attempt to recall councilwoman Pam Murray.  Flev. Decl., ¶ 26, Ex. Y (Aaron Foley, *Nashville (or Detroit?) City Councilwoman Pam Murray faces recall*, MLIVE.COM, Aug. 21, 2009).  In November, Hollin defeated Murray in the resulting recall election.  Flev. Decl., ¶ 27, Ex. Z (Joey Garrison, *Hollin bests Murray in unofficial recall returns*, NASHVILLE CITY PAPER, Nov. 12, 2009).

- In **Baraboo, Wisconsin**, in September of 2009, Peter Chambas ousted District 4 Alderman Michael Cone; Chambas had filed the recall petition.  Flev. Decl., ¶ 28, Ex. AA (Brian D. Bridgeford, *Chambas takes seat: Cone ousted by 65-18 vote in District 4*, BARABOO NEWS REPUBLIC, Sep. 23, 2009); *see also* ¶ 29, Ex. BB (Brian D. Bridgeford, *Cone petition has enough signatures for recall election*, BARABOO NEWS REPUBLIC, Aug. 7, 2009).

- In **Point Pleasant Beach, New Jersey**, in January of 2010, a state judge certified that there were sufficient signatures on a petition to recall Mayor Vincent Barrella.  Flev. Decl., ¶ 30, Ex. CC (MaryAnn Spoto, *Recall of Point Pleasant Beach mayor may apear* [sic] *on general election ballot*, NJ.COM, Jan. 25, 2010).  The community's Democratic municipal chairman announced that he would nominate Stewart Fischer, a recall committee member, to run against Barrella.  *Id.*

- In **Mission Viejo, California**, by January of 2010, Dale Tyler had declared his candidacy to replace Mayor Lance MacLean in an upcoming recall election.  Flev. Decl., ¶ 31, Ex.

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

DD (Niyaz Pirani, *Deputies spend $105,000 in recall election*, ORANGE COUNTY REGISTER, Jan. 29, 2010).  Dale Tyler was one of the initiators of the recall effort.  *Id.*

- In **Poway, California**, by March of 2010, Steve Vaus had declared his candidacy to replace Betty Rexford on the Poway City Council in an upcoming recall election; Mr. Vaus had launched the campaign to recall Rexford.  Flev. Decl., ¶ 32, Ex. EE (Blanca Gonzalez, *Voters will decide on recalling Rexford*, SAN DIEGO UNION-TRIBUNE, Mar. 28, 2010).

- In **Waukesha, Wisconsin**, by May of 2010, Angie E. Van Scyoc, spokeswoman for the campaign to recall the Town Chairman and Supervisor, reported that the group had obtained sufficient signatures to initiate a recall election.  Flev. Decl., ¶ 33, Ex. FF (Mike Johnson, *Town of Waukesha group collects signatures for recall*, MILWAUKEE JOURNAL SENTINEL, May 5, 2010).  By July 13, Ms. Van Scyoc and another recall organizer had become replacement candidates, and indeed were selected as replacements in the recall election.  Flev. Decl., ¶ 34, Ex. GG (Laurel Walker, *Town of Waukesha recall organizers elected*, MILWAUKEE JOURNAL SENTINEL, July 13, 2010).

- In **North Brookfield, Massachusetts**, in August of 2010, Richard P. Chabot announced that he would have a sufficient number of signatures to appear as a replacement candidate in an upcoming special election to recall Robert S. Filipkowski, vice chairman of the Board of Selectmen; Mr. Chabot had spearheaded the recall effort.  Flev. Decl., ¶ 35, Ex. HH (Bradford L. Miner, *Recall battle spawns war of words as Chabot vies to oust Filipkowski*, WORCESTER TELEGRAM & GAZETTE, Aug. 27, 2010).

- In **Dunsmuir, California**, by May 2010, a recall committee had been formed to oust Mayor Peter Arth and Vice Mayor Mario Rubino.  Nick Mitchell and Arlis Steele were

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

among the committee's founding members.  Flev. Decl.,¶ 36, Ex. II (Ami Ridling, *Dunsmuir residents seek to recall mayor and vice mayor*, MTSHASTANEWS.COM, May 12, 2010).  By November 3, in the eventual recall election, Mitchell and Steele were elected to succeed Arth and Rubino.  Flev. Decl., ¶ 37, Ex. JJ (Janet O'Neill, *Dunsmuir voters sweep four out of City Council*, REDDING RECORD SEARCHLIGHT, Nov. 3, 2010).

- In **Apache Junction, Arizona**, in March of 2011, Elliott Fisher was challenging Councilman R.E. Eck Jr. in a recall election; Fisher was behind the recall effort.  Flev. Decl., ¶ 38, Ex. KK (Lindsey Collom, *Apache Junction councilman faces recall in city's election*, ARIZONA REPUBLIC, Mar. 4, 2011).

- In **Huachuca City, Arizona**, in March of 2011, David Perry was a candidate to replace Mayor Bryon Robertson in a recall election; Mr. Perry had started the recall during the previous year.  Flev. Decl., ¶ 39, Ex. LL (Derek Jordan, *Recall vote looms again when voters in Huachuca City go to polls Tuesday*, SIERRA VISTA HERALD, Mar. 4, 2011).

Simply put, the connection between recall campaigns and replacement candidates is distinct and unmistakable.

The link exists whether or not the recall campaign is spearheaded by established politicians or self-styled political novices.  *See, e.g.*, Flev. Decl., ¶ 40, Ex. MM (CBSLosAngeles.com, *Leaders In Bell Recall Ready To Step In As Replacements*, Feb. 3, 2011) ("The recall's leaders—many of them political novices whose efforts initially were fueled by anger—have since joined the March 8 race . . . .").  Indeed, the Plaintiff here, Ms. Farris, reportedly has not ruled out an eventual run for office.  *See* Flev. Decl., ¶ 41, Ex. NN (Sean Robinson, *Meet the driving force behind Washam recall*, THE NEWS TRIBUNE, Mar. 13, 2011) ("She's enjoying the thrill of politics, the juice that infects every first-timer.  She's spoken at

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

political meetings . . . .  Does she see a future in politics?  She doesn't know. . . .  She wouldn't rule out a run for office at this stage . . . .").

Notably, during a recall campaign, replacement candidates often deliberately stay silent about their future plans, for political reasons, but already have formed an intention to run and are working directly with others leading the recall campaign.  *See, e.g.*, Flev. Decl., ¶ 42, Ex. OO (Yesenia Robles, *Easley recall campaign says it has collected enough signatures*, DENVER POST, Mar. 29, 2011) ("The recall question in the special election would be paired with a question of who should replace Easley if recalled.  McBride [who filed and organized the recall effort and submitted at least 6,000 signatures] **said there are at least six people interested in running, but has not released any names**." (emphasis added)).

The connection between recall campaigns and eventual replacement candidates exists even when the vacancy is to be filled by appointment rather than by election.  *See, e.g.*, Flev. Decl., ¶ 43, Ex. PP (Muskegon Chronicle Staff, *Grand Haven School board seat filled*, MLIVE.COM, May 29, 2010) ("Jennifer Williams, one of those involved in the petition drive aimed at removing Brandon Hall from office has been appointed to his seat on the Grand Haven school board.").

In fact, because recall campaigns are so closely tied to elected offices, as opposed to particular legal issues, even subsequent regular elections for the same office show a strong link between recall campaigns and candidates in the election.  *See, e.g.*, Flev. Decl., ¶ 44, Ex. QQ (Paul Rau, *Saginaw Board of Education recall organizers fail to meet Friday petition deadline*, MLIVE.COM, May 1, 2009) (organizer of attempt to recall school board members in Michigan failed to meet signature deadline); *see also* Flev. Decl., ¶ 45, Ex. RR (Tom Gilchrist, *New Saginaw school board members helping pick next chief*, MLIVE.COM, Dec. 19, 2009) (same

BRIEF OF AMICUS CURIAE - 17
Case No. 3:11-cv-05431
K:\2969000\01038\22566_TVF\22566P203I

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

1   organizer ended up on that school board within the same year).

2       Likewise, in Coos Bay, Oregon, in January of 2009, a group led by Larry Van Elsberg

3   filed a petition to recall County Commissioner Kevin Stufflebean.  Flev. Decl., ¶ 46, Ex. SS

4   (Jolene Guzman, *Group wants county commissioner recalled*, THE WORLD, Jan. 21, 2009).  In

5   May, the recall effort failed in an election.  *Id.*  By October of 2010, however, Mr. Van Elsberg

6   was running for an open position as a commissioner, along with three other commissioner

7   candidates (including Mr. Stufflebean).  Flev. Decl., ¶ 47, Ex. TT (Gail Elber, *Chamber quizzes

8   commissioner candidates*, THE WORLD, Oct. 21, 2010).[4]

9

10      In sum, recall campaigns relate directly to particular elected offices, and tend to include

11  (eventual) candidates for those offices, regardless of the method of replacement, and regardless

12  of whether the campaign is run by a novice or a savvy political veteran.  The Plaintiffs' motion

13  for preliminary injunction completely ignores this aspect of recall campaigns.  The Plaintiffs

14  assert, in a simplistic fashion, that "there is no candidate to corrupt," that "a recall campaign is a

15  'ballot proposition' under Washington law," and that recall campaign contributions "fit

16  comfortably in the same category . . . as contributions to independent expenditure groups and

17  ballot measures."  Pls.' Mot. for Prelim. Inj. 13-14, June 21, 2011, ECF No. 13.  Although a

18  recall campaign may be treated like a ballot proposition for some purposes, Washington's

19  campaign contribution limits properly restrict contributions to recall campaigns, not to ballot

20  propositions, likely because of the strong link between recall efforts and replacement candidates.

21  *See* WASH. REV. CODE § 42.17.640(3).  Indeed, Washington's limits are premised upon a desire

22  to avoid "the public perception that decisions of elected officials are being improperly influenced

23

24

25  _____
    [4] Notably, although Van Elserg was only the leader of the recall campaign, and not a candidate, he was considered
26  Stufflebean's "**counterpart**" in media accounts.  Flev. Decl., ¶ 48, Ex. UU (Tim Novotny, *Coos County
    Commissioner defeats recall attempt*, KCBY 11, May 5, 2009) (emphasis added).  Such characterizations further
    demonstrate that leaders of recall campaigns are akin to candidates.

BRIEF OF AMICUS CURIAE - 18
Case No. 3:11-cv-05431

K:\2969000\01038\22566_TVF\22566P203I

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

1 by [large] monetary contributions." WASH. REV. CODE § 42.17.610(2).  Thus, the evidentiary

2 record and Washington law both make clear that the financing of recall campaigns fits within the

3 same category of political activity as campaigns for elected office, rather than ballot measures

4 and independent expenditures.

5 **C.    Large Contributions to Recall Campaigns Raise the Corruption Concerns**

6 **Set Forth in *Buckley* and *Nixon***

7 As shown above, there is extensive evidence of direct and indirect coordination between

8 recall campaigns and subsequent replacement candidacy.  Massive financial contributions made

9 to a recall campaign therefore raise the same serious risk of *quid pro quo* corruption (or

10 appearance of such corruption) that justified the regulations upheld in *Buckley* and *Nixon*.

11 As the Supreme Court has recognized, the actual scope of corruption "can never be

12 reliably ascertained," *Buckley*, 424 U.S. at 27, and preventative measures may be necessary even

13 though "few if any contributions to candidates will involve *quid pro quo* arrangements," *Citizens*

14 *United*, 130 S. Ct. at 908.  The weighty interest in preventing the appearance of pernicious

15 corruption itself "requires that the opportunity for abuse . . . be eliminated."  *Buckley*, 424 U.S. at

16 30.  In the recall context, large contributions create a distinct and serious opportunity for *quid*

17 *pro quo* corruption.  Thus, contribution limits are appropriate to safeguard against that threat.

18 In addition to the examples discussed above, numerous examples from across the country

19 confirm that large contributions to recall campaigns are likely to present a strong appearance of

20 corruption.  For example, in Omaha, Nebraska, in 2010, a recall campaign was formed to oust

21 Mayor Jim Suttle.  Flev. Decl., ¶ 49, Ex. VV (Robynn Tysver, *Battle brews within recall group*,

22 OMAHA WORLD-HERALD, Dec. 8, 2010).  A member of the "Mayor Suttle Recall Committee"

23 accused "possible mayoral candidate David Nabity . . . of trying to 'take control' of the

24 committee to 'enhance his mayoral ambitions.'"  *Id.*  Nabity allegedly came to the group "saying

25 

26 

BRIEF OF AMICUS CURIAE - 19

Case No. 3:11-cv-05431

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

he had friends who wanted to donate," raised about $200,000, and then "began to try to 'take

control' of the group" and turn it into an arm of his own campaign for Mayor—at one point

asking the committee leader to step down.  *Id.*  Nabity allegedly "said if he wasn't allowed to put

his people in charge of the recall effort, he would take 'his donors' and start a new committee."

*Id.*  By all appearances Nabity "was putting his own mayoral campaign team in place and wanted

to control the recall campaign through it . . . ."  *Id.*  That reality evidently was confirmed when

members of the recall committee refused Nabity's demands, and he simply formed his own recall

committee—**and the donors followed him**.  Flev. Decl., ¶ 50, Ex. WW (Brian Mastre, *Follow*

*the Money: Recall Election*, WOWT 6, Jan. 17, 2011) ("The Mayor Suttle Recall Committee . . .

hasn't raised a dime since December 21 . . . because its donors have moved to the recently

formed committee . . . organized for Dave Nabity, who is considering a run for mayor . . . .").

Thus, in the public mind, it became obvious that the "recall campaign" and its donors were

simply financial contributors to Nabity's mayoral aspirations, and the only "recall campaign"

they supported was one that narrowly complied with Nabity's mayoral ambitions.  Public

comments responding to the story of Nabity's political maneuvering and the large contributions

he obtained further confirm the public's major concerns about corruption, and rightly so.  *See*

Flev. Decl., [CITE VV] ("This Recall smells rotten."); *see also, e.g.*, *id.* ("He's a greedy, self

centered politician and cannot be trusted.").  In sum, the large contributions to the recall

campaign could not be divorced from Nabity's involvement and candidacy—and those

contributions raised the very same corruption concerns as upheld in *Buckley* and *Nixon*.

     In another example, the famous 2003 recall of California Governor Gray Davis,

contribution limits were imposed upon candidate campaigns, but not imposed upon recall

campaigns—even if those recall campaigns were explicitly associated with and controlled by

BRIEF OF AMICUS CURIAE - 20
Case No. 3:11-cv-05431

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

declared replacement candidates.  At least one replacement candidate took full advantage, with

questionable results:

> The bifurcated campaign finance system [] allowed candidates for governor to form separate pro-recall committees and raise unrestricted money for those efforts. For example, Schwarzenegger's "Total Recall" committee raised over $4.5 million that it spent largely on advertisements supporting the recall. . . . [T]he Total Recall advertisements featured Schwarzenegger as a spokesman. Unless a viewer noticed the fine print . . . she would be hard-pressed to tell the difference between one funded by the Schwarzenegger campaign committee and one paid for by the "Total Recall" committee. . . .
>
> Thus, the recall campaign presented an unusual example of the usual machinations apparent when candidates devise strategies within a system of some limitations, many loopholes and unregulated channels of money, and different rules for different kinds of campaigns that can nonetheless be run to complement each other. Some loopholes can be closed . . . . [T]he California Fair Political Practices Commission (FPPC) has announced plans to apply contribution limits to ballot-initiative campaign committees controlled by candidates and office holders. Effective after November's elections, the new regulations are clearly a response to Schwarzenegger's aggressive exploitation of the bifurcated rules.

Flev. Decl., ¶ 51, Ex. XX (Elizabeth Garrett, *Democracy in the Wake of the California Recall*,

153 U. PA. L. REV. 239, 250-51 (2004)).  By using his recall campaign as a conduit for uncapped

funding for his gubernatorial ambitions, Schwarzenegger avoided contribution limits and in the

process raised a serous appearance of corruption that policymakers have now worked to undo.

Similarly, in Lake Elsinore, California, starting in 2009, the owner of a local

entertainment center, Michel Knight, instructed **his employee** to serve as the nominal leader of a

campaign to recall Councilman Thomas Buckley, and secretly funneled money into the recall

campaign.  Flev. Decl., ¶ 52, Ex. YY (Michael J. Williams, *Recall campaign activist testifies*,

NORTH COUNTY TIMES, May 25, 2011).  The disgruntled owner "was angry over the

councilman's votes against allowing live entertainment at the center."  Flev. Decl., ¶ 53, Ex. ZZ

(Michael J. Williams, *Businessman ordered to stand trial*, NORTH COUNTY TIMES, May 26,

2011).  Through his employee, Mr. Knight funneled approximately $30,000 into the campaign

and worked with a specific replacement candidate, Steve Manos, in the recall election.  *Id.*; *see*

BRIEF OF AMICUS CURIAE - 21
Case No. 3:11-cv-05431
K:\2969000\01038\22566_TVF\22566P203I

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

*also* Ex. YY.  Although the recall election was unsuccessful, Mr. Manos ran once again in the regular election in November.  Flev. Decl., ¶ 54, Ex. AAA (Michael J. Williams, *Steve Manos undaunted by previous losses*, NORTH COUNTY TIMES, Sep. 24, 2010).  Mr. Knight's illegal concealment of campaign contributions then was discovered.  *See* Flev. Decl., Ex. YY.  In the end, Mr. Knight's concealed funding of the recall campaign, and his coordination of the recall campaign with replacement candidate Steve Manos, presented an appearance of substantial corruption.

As a final example, in Santa Ana, California, in 2003, multimillionaire Ron Unz bankrolled a recall effort led by Vivian Martinez, to oust Santa Ana Unified School District trustee Nativo Lopez.  Flev. Decl., ¶ 55, Ex. BBB (Gustavo Arellano, *Ron Unz Says Recalling Lopez Will Finally Kill Bilingual Education*, OC WEEKLY, Jan. 16, 2003).  Unz contributed over $100,000 to the recall campaign.  *Id.*  Lopez eventually was ousted in the resultant recall election, in which Ms. Martinez was among the replacement candidates.  Flev. Decl., ¶ 56, Ex. CCC (Rob Richardson, *Lopez Walloped in Schools Recall Vote*, LOS ANGELES TIMES, Feb. 5, 2003).  Again, the pattern of large contributions to a recall campaign headed by the replacement candidate raised serious concerns regarding public corruption.

Large contributions to recall campaigns engender corruption, or at a minimum, the appearance of corruption.  This concern "is not an illusory one."  *Buckley*, 424 U.S. at 27.  In fact, given the substantial evidence that recall campaigns routinely involve eventual candidates, the Court need look no further than *Buckley* and *Nixon* to identify a serious risk of corruption.  Because recall campaigns do implicate the government's interest in preventing corruption and the appearance of corruption, reasonable contribution limits may be imposed on such campaigns.

BRIEF OF AMICUS CURIAE - 22
Case No. 3:11-cv-05431

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

**D.     There Is No Evidence That Washington's Recall Limits Suppress Recall Campaigns**

Although reasonable contribution limits may be imposed when the government's interest in preventing corruption is implicated, such limits must not "prevent[] candidates and political committees from amassing the resources necessary for effective advocacy." *Buckley*, 424 U.S. at 21.  In the context of recall campaigns, at least *some* limits on contributions will be reasonable.  And there is no indication, in this case, that Washington's particular recall contribution limits are suppressing political advocacy in an unconstitutional manner.

The Plaintiffs complain that Joan Mell would have used a $3,000 contribution to Plaintiffs "to pay for a copy of the petition as a supplement in the Tacoma *News Tribune*."  Pls.' Mot. for Prelim. Inj. 9, June 21, 2011, ECF No. 13.  Yet it remains entirely unclear why Joan Mell could not have simply spent the $3,000 in question to pay the *Tacoma News Tribune* to print the petition.  The Washington regulations might sometimes compel Ms. Mell to act on her own, but merely compelling "people who would otherwise contribute . . . to expend such funds on direct political expression" is not unconstitutional.  *Buckley*, 424 U.S. at 22.

Regardless, "a showing of one affected individual does not point up a system of suppressed political advocacy that would be unconstitutional under *Buckley*." *Nixon*, 528 U.S. at 396.  Plaintiffs instead must show that the contribution limits have systemically silenced recall campaigns.  Plaintiffs have not attempted to make any such showing of causation, and such a showing would be extremely difficult, not least because recall campaigns face numerous hurdles designed to ensure that they succeed only in extreme circumstances.  The difficulty in collecting a sufficient number of signatures, for example, is entirely appropriate and does not necessitate that contribution limits be lifted.  In sum, the success of a recall campaign is dependent upon a confluence of many factors, including the level of outrage in the community.  *Cf.* Flev. Decl., Ex.

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

FF ("[T]he quick collection of [] signatures shows citizens are frustrated . . . ."); Ex. Y ("Her lack of responsiveness to the community [has] made collecting [] the signatures easy . . . ."). There are no signs that recall campaigns in Washington have been unconstitutionally suppressed. *See, e.g.*, Flev. Decl., ¶ 57, Ex. DDD (John K. Wiley, *Spokane mom wins round in recall fight*, SAN DIEGO UNION-TRIBUNE, June 20, 2005) (noting that a "novice political activist, who argued her case without a lawyer" obtained judicial approval of her petition to recall Spokane Mayor James West); *cf.* Flev. Decl., ¶ 58, Ex. EEE (Ed Merriman, *City Council recalls fail*, BAKER CITY HERALD, Oct. 28, 2009) ("[W]e collected $6,000 in less than a week, and we didn't ask them for a penny.  There were about 100 transactions with donations ranging from $10 to $600." (internal quotations omitted)); ¶ 59, Ex. FFF (KTVU.com, *Nguyen Holds Onto San Jose Council Seat After Recall*, Mar. 3, 2009) ("[T]he 'Recall Madison' campaign has worked as a grassroots effort running on mostly small donations under $40.").

## VI.   CONCLUSION

Limits on contributions to recall campaigns serve the important interest of preventing corruption and the appearance of corruption, and such limits are closely drawn to avoid unnecessary abridgment of associational freedoms.  For the foregoing reasons, this Court should deny Plaintiffs' motion for a preliminary injunction.

DATED this 11th day of July, 2011.

K&L GATES LLP

By        s/Taki V. Flevaris_____
    Theodore J. Angelis, WSBA # 30300
    Taki V Flevaris, WSBA # 42555
Attorneys for Amicus Curiae
Wisconsin Democracy Campaign, Inc.

BRIEF OF AMICUS CURIAE - 24
Case No. 3:11-cv-05431

K:\2969000\01038\22566_TVF\22566P203I

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022