UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

ROBIN FARRIS; RECALL DALE WASHAM, a Washington political committee; and OLDFIELD & HELSDON, PLLC, a Washington professional limited liability company,

Plaintiffs,

v.

DAVE SEABROOK, Chair; BARRY SEHLIN, Vice Chair; DOUGLAS ELLIS, Interim Executive Director; JENNIFER JOLY; and JIM CLEMENTS, in their official capacities as officers and members of the Washington State Public Disclosure Commission,

Defendant.

CASE NO. 3:11-cv-5431 RJB

ORDER ON PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

This matter comes before the Court on Plaintiffs' Motion for Summary Judgment. Dkt. 61. The Court has considered the pleadings filed in support of and in opposition to the Motion and the file herein.

FACTS

This case arises from Plaintiffs' attempts to recall an elected official in Pierce County, Washington, and implicates Washington's campaign finance laws. Dkt. 1. Plaintiffs challenge the constitutionality of two Washington statutes which limit campaign contributions, RCW §§ 42.17A.405(3) and 42.17A.420(1) (the statutes were codified as 42.17.640(3) and 42.17.105(8), respectively, when Plaintiffs filed the Complaint). *Id*.

**A. LEGAL PROCEEDINGS TO RECALL DALE WASHAM**

In 2010, Plaintiff Robin Farris became concerned about the conduct of an elected official, Dale Washam, in Pierce County, Washington. Dkt. 13-1, at 2. Mr. Washam was elected as the Pierce County, Washington Assessor-Treasurer in November of 2008. *Id.* Prompted by her concern about Mr. Washam's behavior, Ms. Farris decided to try to recall him. *Id.* She created a political committee called Recall Dale Washam ("RDW") and registered RDW as a "mini reporting" committee with Washington's Public Disclosure Commission. *Id.* Mini reporting committees are subject to fewer reporting requirements if the committee's contributions and expenditures remain below a certain threshold. *Id.*

On October 29, 2010, Ms. Farris, acting *pro se*, filed six written charges against Mr. Washam with the Pierce County Auditor seeking to place on the ballot the question of whether Mr. Washam should be recalled. Dkt. 13-1, at 2. The auditor arranged for Mr. Washam to be served with the recall charges and referred the matter to the Pierce County, Washington Prosecutor's Office. *In Re Recall of Washam*, 171 Wash.2d 503 (2011). A Special Deputy Prosecuting Attorney formulated a ballot synopsis, arranged for Washam to be served with charges, and on November 12, 2010, petitioned the Pierce County Superior Court to review the adequacy of the charges. *Id.*

In November of 2010, Ms. Farris set up a Recall Dale Washam campaign website (recalldalewasham.org), and a Recall Dale Washam Facebook page that was originally attached to her personal Facebook page. Dkt. 73, at 37. Ms. Farris closed to the public the Facebook page attached to her personal page after a copy of a posting surfaced during the litigation before this Court. *Id*. Ms. Farris then set up a separate Recall Dale Washam Facebook page that could be seen by the public. *Id.* at 39.

Plaintiff Oldfield & Helsdon, PLLC, is a law firm whose principals, Tom Oldfield and Jeff Helsdon, practice law in Pierce County, Washington. Dkts. 13-2; 13-3. They state that they also became aware of numerous allegations regarding Mr. Washam's conduct in office after reading about them in the *Tacoma News Tribune* in 2009 and 2010. Dkts. 13-2, at 1; 13-3, at 1. They state that they also came to believe that for the good of Pierce County, Mr. Washam should be recalled. Dkts. 13-2, at 2; 13-3, at 3.

After reading in the newspaper about the start of recall proceedings in the superior court, on November 16, 2010, Mr. Oldfield and Mr. Helsdon contacted Ms. Farris to offer pro bono legal services for the superior court's sufficiency hearing and the recall effort in general. Dkt. 13-1, at 2. She accepted their offer. *Id.* On November 17, 2010, Ms. Farris, "by then assisted by pro bono counsel, filed an amended request that contained a proper verification under RCW 29A.56.110 and corrected a few typographical errors." *In Re Recall of Washam*, 171 Wash.2d 503 (2011).

The superior court held a hearing on the factual and legal sufficiency of the charges on December 16, 2010. *In Re Recall of Washam*, 171 Wash.2d 503 (2011). The superior court found five of the six charges sufficient. *Id.* The superior court corrected the ballot synopsis by striking one of the charges and by inserting dates. *Id.* The ballot synopsis now reads:

> The charge that Dale Washam, as Pierce County Assessor–Treasurer, committed misfeasance in office, malfeasance in office and/or violated his oath of office alleges that he violated state and local law by (1) retaliating against an employee for filing a complaint against him between January 22, 2009 and March 16, 2010, (2) grossly wasting public funds in pursuing criminal charges against his predecessor as Assessor–Treasurer from January 2, 2009 until October 29, 2010, (3) failing to protect the employee from retaliation, false accusations or future improper treatment between January 22, 2009 and March 16, 2010, and by failing thereafter to rectify his retaliatory actions against his employee, (4) refusing to participate in investigations of whether he had discriminated and retaliated against his employees between January 22, 2009 and March 16, 2010, and (5) discharging his duties in an unlawful and biased manner from January 2, 2009 until October 29, 2010.
>
> Should Dale Washam be recalled from office based on this charge?

*In Re Recall of Washam*, 171 Wash.2d 503 (2011). Ms. Farris and RDW were represented by Mr. Oldfield and Mr. Helsdon at the hearing. Dkt. 13-2, at 3.

On March 3, 2011, the Washington Supreme Court affirmed the superior court's sufficiency determination and the superior court's corrections to the ballot synopsis. *In Re Recall of Washam*, 171 Wash.2d 503 (2011). A written opinion followed on May 12, 2011. *Id.* Ms. Farris and RDW were again represented by Mr. Oldfield and Mr. Helsdon during the Supreme Court proceedings. Dkt. 13-2, at 3. Ms. Farris states that she would not have been able to afford to hire legal assistance for the recall campaign at that point. Dkt. 13-1, at 4.

**B. WASHINGTON'S CONTRIBUTION LIMITS ON RECALL CAMPAIGNS AND THE PUBLIC DISCLOSURE COMMISSION**

RCW § 42.17A.405(3), states that

> No person, other than a bona fide political party or a caucus political committee, may make contributions to a state official, a county official, a city official, a school board member, or a public official in a special purpose district against whom recall charges have been filed, or to a political committee having the expectation of making expenditures in support of the recall of the state official, county official, city official, school board member, or public official in a special purpose district during a recall campaign that in the aggregate exceed eight hundred dollars if for a legislative office, county office, school board office . . .

As implemented by WAC 390-05-400, RCW § 42.17A.405(3) now prohibits contributions over nine hundred dollars.

RCW § 42.17A.420(1) states that

> It is a violation of this chapter for any person to make, or for any candidate or political committee to accept from any one person, contributions reportable under RCW 42.17A.240 in the aggregate exceeding fifty thousand dollars for any campaign for statewide office or exceeding five thousand dollars for any other campaign subject to the provisions of this chapter within twenty-one days of a general election

Under then-RCW § 42.17.020(15)(c), campaign contributions other than money "are deemed to have monetary value." Services furnished at less than their fair market value for the purpose of assisting a political committee are deemed a contribution. *Id.* "Such a contribution must be reported as an in-kind contribution at its fair market value and counts towards any applicable contribution limit of the provider." *Id.*

After contacting Plaintiffs informally, on February 9, 2011, Washington's Public Disclosure Commission ("PDC") issued a "Notice of Administrative Charges" to RDW. Dkt. 13-1, at 12. The PDC alleged that RDW exceeded the limitations for mini campaign reporting before requesting a change in reporting options. *Id*. The PDC also alleged that RDW "violated RCW 42.17.640 (now 42.17A.405(3)) by exceeding the $800 per-election limit on contributions from any one source (other than a bona fide political party or a caucus political committee) to a political committee supporting the recall of an elective county officeholder." *Id.* The PDC stated that it considered that "early contributions to and expenditures by a recall committee, including legal expenses, are subject to reporting." *Id.* at 13. The PDC asserted that as of December 31, 2010, RDW had exceeded the "$500 limit of the mini reporting option on contributions from one source by $21,116.25 and exceeded the $5,000 limit of mini reporting on

total contributions by $19,556.25. Oldfield & Helsdon, PLLC's in kind contributions exceeded the $800 per-election limit in RCW 42.17.640 by $20,816.25." *Id.* at 15.

After receiving correspondence from Plaintiffs, the PDC, by letter, withdrew the February 9, 2011 Notice of Administrative Charges against RDW. Dkt. 13-1, at 35-36. The PDC stated that it intended to reissue charges alleging violations of the reporting requirements. *Id.* at 35. It further stated that

> PDC staff does not intend to allege that Recall Dale Washam violated RCW 42.17.640 by exceeding the $800 per-election limit on contributions from any one source (other than a bona fide political party or a caucus political committee) to a political committee supporting the recall of an elective county officeholder. The fact that the PDC staff does not intend to allege a violation of RCW 42.17.640 should not be construed to mean that the contribution limits of RCW 42.17.640 are not applicable to the recall election. The statute, as written, is to be followed during the recall campaign.

*Id.*

After the PDC issued amended charges regarding the mini committee reporting violations, on April 25, 2011, the PDC and RDW entered into a stipulation. Dkt. 13-2, at 34-40. As part of that stipulation, the PDC recognized that "pro bono legal services rendered by Oldfield & Helsdon, PLLC to RDW after the December 16, 2010, hearing with regard to assisting RDW with the Supreme Court appeal by Dale Washam do not constitute a contribution as defined in RCW § 42.17.020(15)(c)." *Id.* at 39. In addition to the payment of a civil penalty of $500, RDW agreed to not commit "further violations of RCW 42.17 through the election campaign for which RDW was formed." *Id.* The stipulation concluded the charges issued against RDW. *Id.* The stipulation provided that "[b]y virtue of the Commission's issuance of an order approving this stipulation, Recall Dale Washam surrenders all rights to appeal, or otherwise seek judicial review of, such order." *Id.*

The Stipulation, however, did not address the constitutionality of the two statutes at issue.

**C. RECALL PETITION RESULTS**

If Washington's courts find the charges sufficient, sponsors of a recall petition can then begin to collect signatures of legal voters who support the petition. RCW § 29A.56.180. In the case of a county official whose county's population exceeds forty thousand, signatures "equal to twenty-five percent of the total number of votes cast for all candidates for the office to which the officer whose recall is demanded was elected at the preceding election" must be collected. RCW § 29A.56.180(2). Signatures in support of recalling a county officer must be collected and filed within one hundred eighty days after the issuance of a ballot synopsis by the superior court. RCW § 29A.56.150. If the superior court decision is appealed, the period for collecting and filing "signatures begins on the day following the issuance of the decision by the supreme court." *Id.* The county auditor then determines if the petition bears the required number of signatures and verifies the signatures. RCW § 29A.56.210. If enough signatures are properly gathered, the county auditor certifies the petition as sufficient and fixes a "date for the special election to determine whether or not the officer charged shall be recalled and discharged from office." *Id.* If the recall is successful and the office is vacated, the county board of commissioners appoints a successor. RCW § 36.16.110.

RDW had to collect 65,495 valid signatures. Dkt. 75-1, at 14. RDW collected 84,602 signatures. *Id.* The Pierce County Auditor's Office invalidated 20,215 signatures, leaving a total of 64,387 valid signatures. *Id.* The recall petition failed. After late August 2011, once the recall effort failed, Ms. Farris closed down the Recall Dale Washam campaign website that had been used to organize the recall effort. Dkt. 73, at 31.

**D. RDW CONTACTS WITH PIERCE COUNTY COUNCILMEMBERS, ASSESSOR-TREASURER CANDIDATES, AND POTENTIAL CANDIDATES**

One of the issues in this Motion for Summary Judgment is whether Plaintiffs had sufficient contacts and communications with members of the local political community to create the appearance of or actual corruption during the recall effort. Plaintiffs had contacts with several individuals, which will be outlined below.

**1. Pierce County Councilmember Tim Farrell**

Before August of 2011, RDW, through Ms. Farris, had four contacts with Tim Farrell. Dkt. 75, at 21. Ms. Farris exchanged a message with Mr. Farrell on Facebook, met him at a legislative district meeting, met him at a parade, and had a telephone conversation with him. *Id.* Ms. Farris states that she asked Mr. Farrell a question on Facebook about the process for replacing the Assessor-Treasurer if Mr. Washam were recalled. *Id.* at 22. Mr. Farrell responded and explained the process. *Id.* At the time of the Facebook communication, Ms. Farris had heard rumors that Mr. Farrell was a candidate for the Assessor-Treasurer position in 2012. *Id.* at 24. Ms. Farris learned that Mr. Farrell was actually a candidate for the position when she attended the legislative district meeting, sometime after the Facebook contact. *Id.* at 24. After the legislative district meeting, Ms. Farris and Mr. Farrell communicated during a parade regarding a copy of the Facebook post, which surfaced in this litigation. Dkt. 74, at 12. RDW never asked Mr. Farrell to contribute to RDW and Mr. Farrell never contributed to RDW. Dkt. 75, at 25.

**2. Pierce County Councilmember Dick Muri**

Before the recall effort ended in August of 2011, Ms. Farris had five contacts with Mr. Muri, including one e-mail, three telephone conversations, and one interaction at the RDW closing event. Dkts. 74, at 6-9; 75, at 34; 75-1, at 1-2. First, Mr. Muri e-mailed Ms. Farris and asked her to contact him. Dkt. 75, at 34. Ms. Farris then called Mr. Muri and they spoke about

Ms. Farris's background and motivation for initiating the recall petition. *Id.* In the second telephone conversation, Mr. Muri asked Ms. Farris what her plans were for deploying volunteers to collect signatures for the recall petition and gave advice about collecting signatures. Dkt. 75-1, at 1. During the third telephone conversation, Mr. Muri offered to collect signatures. *Id.* at 2. In their final contact, Mr. Muri attended RDW's closing party. *Id.* Ms. Farris states that at no time did she and Mr. Muri discuss possible replacement candidates that the Council would appoint in the event of a successful recall. Dkt. 74, at 8.

**3. Candidate Corrigan Gommenginger**

Mr. Gommenginger contacted Ms. Farris through the RDW website, volunteering to help with the campaign finance reporting requirements. Dkt. 74, at 23. After Ms. Farris did not hear from him regarding his request to volunteer, Ms. Farris contacted him. Dkt. 75-1, at 3. Mr. Gommenginger told Ms. Farris that he could not volunteer after all because he was thinking of running for the Assessor-Treasurer position in 2012. *Id.* On May 15, 2012, Mr. Gommenginger posted on his website (voteforcorrigan.com) that he was dropping out of the race and that he was endorsing candidate Billie O'Brien. *Id.* at 17.

**4. Candidate Billie O'Brien**

Ms. Farris had five contacts with Ms. O'Brien, an employee of the Assessor-Treasurer's Office, which included telephone conversations, text massages, one meeting at a public auction, and one meeting after the recall campaign failed. Dkts. 74, at 14; 75, at 26. Ms. Farris stated that Ms. O'Brien never expressed to Ms. Farris an interest in running for the Assessor-Treasurer position. Dkt. 74, at 23. Ms. O'Brien eventually filed her candidacy in June of 2012. *Id.* at 25. Ms. Farris and Ms. O'Brien first contacted each other on the telephone, during which Ms. O'Brien provided background information to Ms. Farris about the function of the Assessor-

Treasurer's Office. Dkt. 75, at 26. In November of 2010, Ms. Farris attended an Assessor-Treasurer's property auction where she interacted with Ms. O'Brien in a group setting with other employees of the Assessor-Treasurer's Office and talked about Dale Washam's absence at the auction. Dkts. 75, at 25-27; 74, at 24-25. Ms. Farris also texted Ms. O'Brien and other employees to update them on the results of RDW's litigation in superior court. Dkts. 75, at 26; 74, at 25. RDW never asked for nor did Ms. O'Brien give any contributions to RDW. Dkt. 75, at 28. Finally, Ms. Farris and Ms. O'Brien met after the recall petition failed and discussed why Ms. O'Brien was running for Assessor-Treasurer. *Id.*

**5. Candidate Mike Lonergan**

Ms. Farris had two contacts with Mr. Lonergan, one during the recall campaign and one after the campaign. Dkt. 74, at 26-27. First, in the spring of 2011, Ms. Farris acted as a call-in guest on Mr. Lonergan's radio talk show, during which Ms. Farris talked for two or three minutes about the recall. *Id.* at 26. Later, in June of 2012, Ms. Farris and Mr. Lonergan met for coffee. *Id.* at 27. Ms. Farris stated that, during this meeting, she believed that Mr. Lonergan wanted her to endorse him, which she did not. *Id.* During the recall campaign, no one indicated to Ms. Farris that Mr. Lonergan was considering running for the Assessor-Treasurer position. *Id.*

**6. Candidate Spiro Manthou**

Ms. Farris and Mr. Manthou had one contact. In June of 2012, they met, and Mr. Manthou asked for Ms. Farris's endorsement. Dkt. 74, at 28. She did not give him an endorsement. *Id*. Ms. Farris had no contact with Mr. Manthou during the recall campaign and no one indicated to her that Mr. Manthou was considering running for the Assessor-Treasurer position. *Id*.

**7. Candidate Dale Washam**

Ms. Farris and Mr. Washam never made contact with each other, except during the two recall petition sufficiency hearings in superior court. Dkt. 74, at 29. During the recall campaign, Ms. Farris did not know that he was running for re-election. *Id.*

**8. Contacts with Assessor-Treasurer Office Employees and the Office's Union**

During the recall campaign, RDW and Ms. Farris had several communications with Assessor-Treasurer Office employees (Dkt. 74, at 13-14) and Teamsters Local 117, the union representing the Office's employees (Dkt. 75-2, at 10-25). The Office's employees provided Ms. Farris with background information about the Office. Dkt. 74, at 13-14. Also, Ms. Farris produced a strategic program for the Teamsters to identify, train, and mentor Teamster 117 candidates to run for local political office in the future. Dkt. 75-2, at 21-25.

PROCEDURAL HISTORY

**A. MOTION FOR PRELIMINARY INJUNCTION**

On June 21, 2011, Plaintiffs filed a Motion for Preliminary Injunction, arguing that enforcement of RCW § 42.17.640(3) (now 42.17A.405(3)) violates Plaintiffs' free speech protections under the First Amendment of the United States Constitution by limiting the amount of contribution that a person may donate to a recall committee. Dkt. 13. On July 15, 2011, this Court granted Plaintiffs' Motion. Dkt. 30. On January 19, 2012, the Ninth Circuit Court of Appeals affirmed (case no. 11-35620). Dkt. 48. The appeals court reasoned that Plaintiffs would likely succeed on the merits and would suffer irreparable harm by engaging in protected political speech because Defendants had not shown any evidence of the appearance of or actual corruption between RDW and any candidates, potential candidates, or councilmembers. Dkt. 48.

**B. MOTION FOR SUMMARY JUDGMENT**

On August 28, 2012, Plaintiffs filed this Motion for Summary Judgment. Dkt. 61. Plaintiffs argue that RCW §§ 42.17A.405(3) and 42.17A.420(1) are unconstitutional facially and as applied to Plaintiffs because (1) the structure of Washington's recall process prohibits recall committees from coordinating their campaigns with replacement candidates, which negates the appearance of quid pro quo corruption; (2) a disproportionate influence from recall committees is not a sufficient justification for enforcing contribution limits on recall campaigns; and (3) lack of voter access to contributor information is not a sufficient justification for enforcing contribution limits on recall campaigns. Dkt. 61.

In response, Defendants first argue that Plaintiffs request to enjoin enforcement of RCW §§ 42.17A.405(3) and 42.17A.420(1) is moot because (1) there is no live controversy, given that the recall campaign has ended; (2) RCW § 42.17A.420(1) never applied to Plaintiffs, given that the campaign ended prior to the date when RCW § 42.17A.420(1) would have taken effect; and (3) RCW § 42.17A.420(1) has already been declared unconstitutional. Dkt. 70, at 9-12. Alternatively, Defendants argue that the provisions at issue are facially constitutional because Plaintiffs cannot show that the provisions are substantially overbroad by infringing on protected speech because the government has a legitimate interest in deterring the appearance of corruption. *Id.* at 13-15. Last, Defendants argue that the provisions are constitutional as applied to Plaintiffs because there are issues of material fact regarding an appearance of corruption between RDW, Ms. Farris, existing and subsequent candidates, candidate committee staff, and to and from the Council that would appoint a successor in the event of a successful recall. *Id.* at 17.

In reply, Plaintiffs argue that the case is not moot because it is capable of repetition and would evade review if not reviewed by this Court. Dkt. 76, at 5-6. Second, Plaintiffs argue that RCW § 42.17A405(3) is unconstitutional on its face and as applied to Plaintiffs because (1) there is no actual or appearance of corruption, given that no evidence exists showing RDW contributed

to or coordinated with candidates; and (2) the provision is overbroad by prohibiting a substantial amount of protected speech. *Id.* at 6-12.

In their Surreply, Defendants request that the Court strike several declarations filed in support of Plaintiffs' Reply: the declarations of (1) Robin Farris (Dkt. 77); (2) Jeanette Peterson (Dkt. 78); (3) Jeffrey P. Helsdon (Dkt. 79); (4) Thomas Oldfield (Dkt. 80); and (5) Tracey Apata (Dkt. 81). Dkt. 83. Defendants also request that the Court strike those portions of Plaintiffs' Reply that rely on these declarations. *Id*. Defendants argue that the declarations (1) are not properly sworn; (2) are not attested to being made from personal knowledge; and (3) assert new issues based on previously undisclosed facts. *Id*.

SUMMARY JUDGMENT STANDARD

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the non moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)(nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt."). *See also* Fed.R.Civ.P. 56(e). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty*

*Lobby, Inc.*, 477 .S. 242, 253 (1986); *T.W. Elec. Service Inc. v. Pacific Electrical Contractors Association*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The court must consider the substantive evidentiary burden that the nonmoving party must meet at trial – e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254, T.W. *Elect. Service Inc.*, 809 F.2d at 630. The court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party. The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elect. Service Inc.*, 809 F.2d at 630 (relying on *Anderson, supra*). Conclusory, non specific statements in affidavits are not sufficient, and "missing facts" will not be "presumed." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89 (1990).

## DISCUSSION

### A. Motion to Strike

Defendants argue that the declarations supporting Plaintiffs' Reply (1) are not properly sworn; (2) are not attested to being made from personal knowledge; and (3) assert new issues based on previously undisclosed facts. Dkt. 83.

"It is well established that new arguments and evidence presented for the first time in Reply are waived." *Docusign, Inc. v. Sertifi, Inc.*, 468 F. Supp. 2d 1305, 1307 (W.D. Wash. 2006). Here, Plaintiffs presented the new issue of standing that was not contained in their original Motion. Nor were the facts regarding Plaintiffs' current recall efforts disclosed in the filings with Plaintiffs' original Motion. For these reasons, the Court should grant Defendants' Motion to Strike the declarations of (1) Robin Farris (Dkt. 77); (2) Jeanette Peterson (Dkt. 78);

(3) Jeffrey P. Helsdon (Dkt. 79); (4) Thomas Oldfield (Dkt. 80); (5) Tracey Apata (Dkt. 81); and those portions of Plaintiffs' Reply that rely on these declarations.

**B. Standing**

Defendants argue that RCW § 42.17A.405(3) is moot because RDW has ceased operations. Defendants also argue that RCW § 42.17A.420(1) is moot because RDW efforts failed and never reached the general election ballot, and because the court in *Family PAC v. McKenna*, 685 F.3d 800 (9th Cir. 2012) already ruled that RCW § 41.17A.420(1) is unconstitutional.

Plaintiffs argue that RCW § 42.17A.405(3) is not moot because Plaintiffs' actions are capable of repetition and would evade review if not reviewed by this Court. Plaintiffs do not argue against the mootness of the challenge to RCW § 42.17A.420(1).

"A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen v. Wright*, 468 U.S. 737, 751 (1984). To determine if a case is moot, a court must decide if it can give any effective relief in the event that it decides the matter on the merits; if a court can grant such relief, the matter is not moot. *Enyart v. Nat'l Conference of Bar Examiners, Inc.*, 630 F.3d 1153, 1159 (9th Cir. 2011). "The exception applies where (1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." *Id.* (citation omitted)

1. RCW § 42.17A.420(1): $5,000 Limit

The Ninth Circuit in *Family PAC v. McKenna*, 685 F.3d 800 (9th Cir. 2012) ruled that RCW § 42.17A.420(1) is unconstitutional. It is unnecessary for this Court to review the constitutionality of RCW § 42.17A.420(1). The Plaintiffs' challenge to RCW § 42.17A.420(1) is

moot and, therefore, they do not have standing. To the extent Plaintiffs' Motion is based on a challenge of RCW § 42.17A.420(1), it should be denied.

2. RCW § 42.17A.405(3): $900 Limit

On appeal from this Court's preliminary injunction, the Ninth Circuit held that the exception to the mootness doctrine applied in this case because "[t]he parties could not practically obtain appellate review of the district court order within this time. Furthermore, if the plaintiffs attempt another recall, they will be subject to the same $800 contribution limit." *Farris v. Seabrook*, 677 F.3d 858, 863-64 (9th Cir. 2012) (citation omitted). Nothing has changed this rationale for applying the exception to the mootness doctrine in this case. This Court should find that Plaintiffs' challenge to RCW § 42.17A.405(3) is not moot and, therefore, they have standing.

**C. Constitutionality of RCW § 42.17A.405(3): $900 Limit**

1. As-Applied Challenge

Defendants contend that Plaintiffs have had sufficient contact and communication with candidates, potential candidates, councilmembers, union representatives, and employees of the Assessor-Treasurer's Office to create the appearance of corruption. Plaintiffs argue that these contacts are insufficient to create the appearance of corruption because RDW did not coordinate expenditures during any of these contacts and communications.

On appeal from this Court's preliminary injunction, the Ninth Circuit outlined the law governing First Amendment challenges to contribution limits for recall committees. "Under the First Amendment, contribution limitations are permissible as long as the Government demonstrates that the limits are closely drawn to match a sufficiently

important interest. . . . [S]tates have an important governmental interest in preventing the actuality or appearance of quid pro quo corruption. . . . This anticorruption interest justifies limits on contributions to political committees operated by candidates themselves. . . . It also justifies limits on contributions to committees that, although formally separate from the candidate, are sufficiently close to the candidate to present a risk of actual or apparent corruption." *Farris*, 677 F.3d at 865 (internal citations omitted).

The *Farris* Court continued

> On the other hand, both this court and the Supreme Court have rejected contribution limits as applied to committees having only a tenuous connection to political candidates. In *Citizens United*, the Court held that a federal law restricting corporate and union spending on electioneering communications that support or oppose a political candidate could not be sustained by the anticorruption interest. The Court reasoned that the absence of prearrangement and coordination of an expenditure with the candidate or his agent not only undermines the value of the expenditure to the candidate, but also alleviates the danger that expenditures will be given as a *quid pro quo* for improper commitments from the candidate.
>
> Similarly, in *Long Beach*, we invalidated contribution limits as applied to political action committees making independent expenditures to support or oppose candidates for office. We explained that:
>
> > the strength of the state's interest in preventing corruption is highly correlated to the nature of the contribution's recipient. Thus, the state's interest in the prevention of corruption—and, therefore, its power to impose contribution limits—is strongest when the state limits contributions made directly to political candidates. . . . As one moves away from the case in which a donor gives money directly to a candidate, however, the state's interest in preventing corruption necessarily decreases.
>
> We observed that the Supreme Court has upheld limitations on contributions to entities whose relationships with candidates are sufficiently close to justify concerns about corruption or the appearance thereof. Because the political action committees made independent expenditures and were several significant steps removed from the case in which a donor gives money directly to a candidate, we held that the state's anticorruption interest was insufficient to uphold the contribution limits.
>
> Like independent expenditure committees, recall committees in Washington have at most a tenuous relationship with candidates. The contribution limit here is thus materially indistinguishable from the limit we invalidated in *Long Beach*. Under Washington's recall system, political committees seeking to

> recall officials do not coordinate their spending with candidates for office. In the event a recall is successful, the successor to office is appointed by a governmental entity designated by state law—in this case, the Pierce County Council. *See* Wash. Rev. Code § 36.16.110; Pierce County, Wash., Charter art. 4, § 4.70. Thus, as Washington law is structured, expenditures by recall committees are similar to independent expenditures. Given that recall committees do not coordinate or prearrange their independent expenditures with candidates, and they do not take direction from candidates on how their dollars will be spent, they do not have the sort of close relationship with candidates that supports a threat of actual or apparent corruption.

*Farris*, 677 F.3d at 866-67 (internal citations and quotations omitted).

The Ninth Circuit, however, left open the possibility that "the outcome might be different if there were evidence that contributions were being made with a 'wink and a nod' from Council members indicating that a particular candidate would be appointed." *Farris*, 677 F.3d at 867 n.8. Therefore, although Washington law is structured to prevent recall committees from coordinating expenditures with candidates, the Ninth Circuit recognized that the possibility of coordination does exist. That possibility is at issue in the Motion for Summary Judgment before this Court.

Here, there is no evidence in the record that that contributions were made with 'a wink and a nod' from Councilmembers about who the Council would appoint in the event of a successful recall. RDW's communication with Councilmember Farrell only involved relaying information about the recall process via Facebook. RDW's communication with Councilmember Muri only involved explaining Ms. Farris's motivation for starting the recall, and relaying information and advice about plans to collect signatures for the recall effort.

There is no evidence that Plaintiffs coordinated expenditures with candidates or potential candidates. RDW's communication with Candidate Gommenginger only involved a withdrawn request to volunteer for RDW. RDW's communication with Candidate O'Brien only involved providing information on how the Assessor-Treasurer's Office functioned, questioning why Dale Washam was not present at a property auction, updating Candidate O'Brien and other Assessor-

Treasurer employees about RDW's litigation in superior court, and, after RDW ceased operations, why Candidate O'Brien was running for office. Further, RDW's communications with Candidate Lonergan only involved Ms. Farris informing Mr. Lonergan's radio show listeners about RDW's recall efforts, and, after RDW ceased operations, Ms. Farris's denied endorsement of Mr. Lonergan. Also, RDW's communication with Candidate Manthou, after RDW ceased operations, only involved Ms. Farris's denied endorsement of Mr. Manthou.

Finally, there is no evidence of coordination between Plaintiffs and employees of the Assessor-Treasurer's Office or union representatives in regards to contributions, expenditures, or election of a new Assessor-Treasurer.

In sum, the only evidence presented regarding RDW communications concerns exchanges of information about the recall process, the progress of RDW's recall efforts, denial of requests for endorsements after RDW ceased operations, and innocuous exchanges between local political professionals. There is no evidence of coordination of expenditures or 'a wink and a nod' to justify the State's anti-corruption interest. The Government has presented no evidence demonstrating an issue of material fact regarding the appearance of or actual corruption.

For these reasons, the Court should grant summary judgment for Plaintiffs and hold RCW § 42.17A.405(3) unconstitutional as applied to Plaintiffs.

2. Facial Challenge

Because this Court should provide Plaintiffs' requested relief and hold that RCW § 42.17A.405(3) is unconstitutional as applied to Plaintiffs, the Court need not address whether RCW § 42.17A.405(3) is unconstitutional on its face.

Accordingly, it is hereby **ORDERED** that Plaintiffs' Motion for Summary Judgment (Dkt. 61) is **GRANTED**. Defendants are permanently enjoined from enforcing RCW § 42.17A.405(3) against Plaintiffs in this case only.

The Clerk is directed to send uncertified copies of this Order to all counsel of record and to any party appearing pro se at said party's last known address.

Dated this 6th day of November, 2012.

ROBERT J. BRYAN
United States District Judge